975 So.2d 1090 (2008)
Crosley A. GREEN, Appellant/Cross-Appellee,
v.
STATE of Florida, Appellee/Cross-Appellant.
Crosley Alexander Green, Petitioner,
v.
James R. McDonough, etc., Respondent.
Nos. SC05-2265, SC06-1533.
Supreme Court of Florida.
January 31, 2008.
Rehearing Denied January 31, 2008.
*1097 John W. Jennings, Capital Collateral Regional Counsel, and Mark S. Gruber, Assistant CCR Counsel, Middle Region, Tampa, FL, for Appellant/Cross-Appellant/Petitioner.
Bill McCollum, Attorney General, Tallahassee, Florida, and Barbara C. Davis, Assistant Attorney General, Daytona Beach, FL, for Appellee/Cross-Appellee/Respondent.
PER CURIAM.
Crosley Green appeals an order of the circuit court granting in part and denying in part his motion to vacate his first-degree murder conviction and sentence of death. He also petitions this Court for a writ of habeas corpus.[1] The State cross-appeals, challenging the trial court's order granting Green a new penalty phase. As explained below, we affirm the trial court's order and deny Green's petition.

I. FACTS AND PROCEDURAL HISTORY
On direct appeal, we summarized the facts of the crime as follows:
Late in the evening of April 3, 1989, Kim Hallock and [Charles] Flynn, whom she had dated, drove to a park in Flynn's pickup truck. They parked near dunes in a wooded area and smoked marijuana. As they smoked, a sheriff's car drove by and shined its spotlight, but did not stop at the truck. After the sheriff's car passed, a man walked in front of the truck and stopped at the driver's door. He warned Hallock and Flynn to watch out for the police, then walked on.
A few minutes later, Flynn stepped outside the truck to relieve himself. Hallock testified that she soon heard Flynn say nervously: "Hold on. Wait a minute, man. Hold on. Put it down." She retrieved a gun from the truck's glove compartment and put it under some jeans on the seat next to her. She *1098 testified that when she looked outside the truck, she saw the man she had seen earlier. He was now walking around Flynn and carrying a gun. The man ordered Flynn to the ground, then asked if either of them had any money. Hallock gave him five dollars, but Flynn said he had no money.
The man then tied Flynn's hands behind his back with shoelaces. While tying Flynn's hands, the man's gun went off but did not injure Flynn. The man pulled Flynn off the ground, found a wallet in his pants, and threw it to Hallock, who counted $185.
The man ordered Hallock to start the truck and to move to the center seat. He put Flynn in the passenger seat and started driving. He forced Flynn and Hallock to ride with their heads down and held a gun to Hallock's side. During the ride, Flynn found the gun Hallock had hidden under the jeans. The man stopped the truck at an orange grove and tried to pull Hallock from the truck. Hallock freed herself and ran around the truck, but the man caught her, threw her to the ground, put a gun to her head, and threatened to blow her brains out. Flynn got out of the truck and fired a shot, but missed the man. Hallock jumped into the truck and locked the doors. She testified that she saw the man fire a shot. Flynn yelled for her to escape, and Hallock drove to a friend's house and called the police.
When police arrived at the orange grove, they found Flynn lying facedown with his hands tied behind his back. Authorities found a loaded .22-caliber revolver nearby. Flynn was alive when police arrived, but he stopped breathing several times and died of a single gunshot wound to the chest before paramedics arrived. Hallock later identified Green as the man she saw in the park.
In sentencing Green to death, the trial judge found four aggravating factors: (1) Green was previously convicted of a violent felony; (2) the capital felony was committed while Green was engaged in kidnapping; (3) the murder was committed for pecuniary gain; and (4) the murder was especially heinous, atrocious, and cruel. The judge found no statutory or nonstatutory mitigating factors. He also sentenced Green to four concurrent twenty-year sentences for the robbery and kidnapping convictions. These terms were to be served consecutively to the death sentence.
Green v. State, 641 So.2d 391, 393-94 (Fla. 1994). We affirmed Green's sentence and conviction on direct appeal.[2]
*1099 Green subsequently filed a motion for postconviction relief pursuant to rule 3.851, Florida Rules of Criminal Procedure (1996), in which he raised several claims and subclaims.[3] The trial court held an evidentiary hearing, and subsequently granted Green a new penalty phase proceeding based on counsel's failure to investigate Green's prior New York robbery case.

II. GUILT PHASE ISSUES ON APPEAL
Green raises the following six guilt phase issues on appeal: (1) Green's convictions are constitutionally unreliable as established by newly discovered evidence; (2) Green was denied due process under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), when the State suppressed evidence; (3) trial counsel provided constitutionally ineffective assistance; (4) the trial court erred in denying relief with regard to dog tracking evidence; (5) the rules prohibiting Green's lawyers from interviewing jurors are unconstitutional; and (6) the trial court erred in summarily denying Green's claims regarding juror misconduct and counsel's failure to challenge cross-race identification. We address each in turn below. Because we affirm the trial court's order granting a new penalty phase based on the issue raised in the State's cross-appeal regarding Green's prior New York robbery case, we do not reach the other penalty phase issues provisionally asserted in Green's postconviction appeal.

A. Newly Discovered Evidence
Green first argues that his convictions are constitutionally unreliable as established by newly discovered evidence. To obtain a new trial based on newly discovered evidence, a defendant must meet two requirements: First, the evidence must not have been known by the trial court, the party, or counsel at the time of trial, and it must appear that the defendant or defense counsel could not have known of it by the use of diligence. Second, the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial. See Jones v. State, 709 So.2d 512, 521 (Fla.1998) (Jones II). Newly discovered evidence satisfies the second prong of this test if it "weakens the case against [the defendant] so as to give rise to a reasonable doubt as to his culpability." Id. at 526 (quoting Jones v. State, 678 So.2d 309, 315 (Fla. 1996) (Jones I)). In determining whether the evidence compels a new trial, the trial court must "consider all newly discovered evidence which would be admissible," and must "evaluate the weight of both the newly discovered evidence and the evidence which was introduced at the trial." Jones v. State, 591 So.2d 911, 916 (Fla.1991). This determination includes
whether the evidence goes to the merits of the case or whether it constitutes impeachment evidence. The trial court should also determine whether the evidence is cumulative to other evidence in *1100 the case. The trial court should further consider the materiality and relevance of the evidence and any inconsistencies in the newly discovered evidence.
Jones II, 709 So.2d at 521 (citations omitted).
When the trial court rules on a newly discovered evidence claim after an evidentiary hearing, we review the trial court's findings on questions of fact, the credibility of witnesses, and the weight of the evidence for competent, substantial evidence. Melendez v. State, 718 So.2d 746, 747-48 (Fla.1998); Blanco v. State, 702 So.2d 1250, 1251 (Fla.1997). As with rulings on other postconviction claims, we review the trial court's application of the law to the facts de novo. Cf. Hendrix v. State, 908 So.2d 412, 423 (Fla.2005) (reviewing de novo the trial court's application of the law to the facts in ruling on a postconviction claim that the government withheld material evidence); Gore v. State, 846 So.2d 461, 468 (Fla.2003) (reviewing de novo the application of the law to the facts on a claim of ineffective assistance of trial counsel).
Green argues that his convictions are constitutionally unreliable in light of the subsequent recantations of three of the State's guilt phase witnesses. Green also argues that the trial court erred by considering new evidence of guilt at the evidentiary hearing, including the testimony of Layman Lane and mitochondrial DNA (mDNA) testing on hair fragments found in the victim's truck. We address both of these arguments in turn.

(1) New Evidence Negating Guilt
First, Green argues that his convictions are constitutionally unreliable in light of the fact that Sheila Green, Lonnie Hillery, and Jerome Murray, three of the State guilt phase witnesses, have recanted their trial testimony. The trial court made the following factual findings: First, Jerome Murray testified at Green's trial that, shortly after the murder, Green admitted committing it and said he was going to disappear. At the postconviction evidentiary hearing, the defense introduced three out-of-court statements made by Murray in which he recanted his trial testimony. In these statements, Murray stated that his entire testimony was a lie and that he was under pressure from law enforcement to fabricate. However, at the evidentiary hearing, Murray claimed that he did not remember making these post-trial statements because he was either tired or drunk. When questioned about whether his post-sentencing statements were inconsistent with his trial testimony, Murray exercised his Fifth Amendment privilege against self-incrimination.
Second, Sheila Green is Crosley Green's sister. At Green's trial, Sheila testified that the day after the homicide, Green admitted his involvement in the shooting to her. Sheila had been convicted in federal court for drug offenses and testified against Green in return for consideration for a more lenient sentence for herself. At the evidentiary hearing, Sheila testified that her testimony at Green's trial was untrue and that Green never confessed to murdering Charles Flynn.
Third, Lonnie Hillery is the father of Sheila Green's child, and was her boyfriend at the time of Green's trial. Hillery also testified that Green admitted his involvement in the shooting to him. At the evidentiary hearing, Hillery said that he made up the story as part of a plea deal to help Sheila receive a more lenient sentence in her case.
We affirm the trial court's denial of this claim. Jerome Murray's out of court recantation would not likely produce an acquittal on retrial because it would only serve as impeachment to his original testimony. *1101 Further, the postconviction court found both Sheila Green's and Lonnie Hillery's recantations incredible based on their responses, demeanor, and body language. We generally defer to the trial judge regarding these credibility determinations. See Melendez, 718 So.2d at 747-48; Blanco, 702 So.2d at 1251; see also Bell v. State, 90 So.2d 704, 704 (Fla.1956) ("[R]ecanting testimony is exceedingly unreliable, and it is the duty of the court to deny a new trial where it is not satisfied that such testimony is true."). Moreover, when weighed against the other admissible evidence, the recantations of Jerome Murray, Sheila Green, and Lonnie Hillery do not create a reasonable probability of acquittal on retrial. See Jones, 591 So.2d at 915.

(2) New Evidence of Guilt
Green further claims the trial court erred in considering the postconviction testimony of Layman Lane (who testified that, a few days after the murder, Green admitted shooting someone) and mDNA test results on several hairs found in Flynn's truck (which did not rule out Green as a contributor). Green cites Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), arguing that substantive evidence of guilt must be found by a jury beyond a reasonable doubt. However, Apprendi and Ring are inapplicable because they require a jury determination only for facts which would increase the penalty for the crime beyond the prescribed statutory maximum. On a motion for postconviction relief alleging newly discovered evidence, the trial court is not imposing a sentence, but rather, is considering all admissible evidence and evaluating whether a new trial is warranted. See Jones, 591 So.2d at 915. This includes new evidence of guilt.
Moreover, even if the trial court erred in considering this evidence, such error was harmless. The trial court listed a plethora of other admissible evidence of Green's guilt, including: (1) trial testimony of the surviving victim identifying Green as the person who robbed, abducted, and shot Charles Flynn; (2) trial testimony of two witnesses who saw Green earlier in the evening at Holder Park, the location where the abduction occurred; (3) trial testimony of Deputy O'Dell Kiser tracking the scent from the abduction scene to Green's sister's residence near Holder Park; (4) trial testimony of Sheila Green of Green's admission to the shooting, which is admissible upon retrial as substantive evidence; (5) trial testimony of Lonnie Hillery of Green admitting to being involved in an altercation, which is admissible upon retrial as substantive evidence; (6) trial testimony of Jerome Murray that Green killed somebody and was going to disappear. Therefore, the trial court's decision did not hinge on Lane's testimony or the mDNA evidence. Even without this evidence, the dubious recantations of Murray, Hillery, and Sheila Green do not weaken the case against Green so as to give rise to a reasonable doubt as to his culpability. See Jones II, 709 So.2d at 521.

B. Suppression of Evidence
Next, Green argues that he was denied due process under Brady when the State suppressed documents related to a box of loose photographs used in creating a composite drawing of the perpetrator. Because Green fails to prove materiality, this claim is denied.
Brady requires the State to disclose material information within its possession or control that is favorable to the defense. Mordenti v. State, 894 So.2d 161, 168 (Fla.2004). To establish a Brady violation, the defendant has the burden to show (1) that favorable evidenceeither *1102 exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the State, and (3) because the evidence was material, the defendant was prejudiced. Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); see also Way v. State, 760 So.2d 903, 910 (Fla.2000). To meet the materiality prong, the defendant must demonstrate a reasonable probability that had the suppressed evidence been disclosed the jury would have reached a different verdict. Strickler, 527 U.S. at 289, 119 S.Ct. 1936. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Way, 760 So.2d at 913; see also Strickler, 527 U.S. at 290, 119 S.Ct. 1936. The remedy of retrial for the State's suppression of evidence favorable to the defense is available when "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Strickler, 527 U.S. at 290, 119 S.Ct. 1936 (quoting Kyles v. Whitley, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). Giving deference to the trial court on questions of fact, this Court reviews de novo the application of the law and independently reviews the cumulative effect of the suppressed evidence. See Mordenti, 894 So.2d at 169; Way, 760 So.2d at 913.
Green submitted an exhibit consisting of evidence he claims was suppressed by the State, including: (1) a series of three-by-five cards with information about certain individuals handwritten on them; (2) police reports referring to the names on the cards; and (3) booking photos accompanying documents titled "case memorandum" with names, addresses and other identifying data. The three-by-five cards had notations made by Sergeant Thomas Fair, supervisor of the homicide squad of the Brevard County Sheriff's Department, as Kim Hallock was going through a box of loose photographs. The individuals in the photographs corresponded to persons on the cards and other documents in Green's exhibit. According to the testimony of investigating officers, Hallock viewed these photographs and picked out individuals who had facial characteristics similar to those of the perpetrator to assist a police artist in creating a composite drawing of the suspect. Based on these photos, a composite drawing was created and circulated, and as a result, Green was developed as a suspect. According to Green, the photographs were returned to wherever they came from so that, despite defense counsel's efforts to find out, it became impossible to reconstruct whose photographs were shown to Hallock or which ones she picked out. Green contends that the overwhelming likelihood is that his photo was mixed in with the loose photos, and that Kim Hallock did not identify him. Green argues that this could have provided a new basis for impeachment of Hallock's subsequent identification of Green in a photo lineup containing a photograph of Green obtained from the Department of Corrections.
At the evidentiary hearing, defense counsel Parker first testified that he did not recall whether he received these documents. Parker stated that if he had these documents, he would have utilized them during the course of the suppression hearing regarding identity. However, later, Parker testified that he thought he did, in fact, receive the three-by-five cards because he believed he had the photograph of a person named Mitchell whom he attempted to develop as another suspect. Parker testified that he was aware that Hallock looked through the box of photographs and picked out photographs of individuals who looked similar to the murderer.
We affirm the trial court's denial of this claim. Notes from which a police *1103 or investigative report were compiled are not subject to disclosure under Florida Rule of Criminal Procedure 3.220(b)(1)(B). See Terry v. State, 668 So.2d 954, 959-60 (Fla.1996); Geralds v. State, 601 So.2d 1157 (Fla.1992). Moreover, it is unclear whether defense counsel Parker received the documents. And, even if Parker did not receive the documents, it would be speculation to conclude that Green's photograph was in the initial box of loose photographs. Therefore, Green fails to establish a reasonable probability that the jury would have reached a different verdict had this evidence been presented. See Strickler, 527 U.S. at 289, 119 S.Ct. 1936.

C. Ineffective Assistance of Counsel
Next, Green argues that he received ineffective assistance of counsel. In Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Court established a two-prong standard for determining whether counsel provided constitutionally ineffective assistance. First, a defendant must point to specific acts or omissions of counsel that are "so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687, 104 S.Ct. 2052. Second, the defendant must establish prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S.Ct. 2052. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." Id. Claims of ineffective assistance present mixed questions of law and fact subject to plenary review. Occhicone v. State, 768 So.2d 1037, 1045 (Fla.2000). This Court independently reviews the trial court's legal conclusions and defers to the trial court's findings of fact.
Green argues that his trial counsel was constitutionally ineffective for (1) failing to obtain and maintain a file obtained from his predecessor defense counsel; (2) failing to impeach Kim Hallock; (3) failing to impeach Jerome Murray; and (4) failing to challenge a prospective juror.

(1) The Defense File
Green alleges that a file containing a photographic lineup that was proffered at his bond hearing, a copy of which was provided to predecessor defense counsel, Assistant Public Defender Greg Hammel, should have been transferred and preserved by trial counsel, Rob Parker. Green claims that a different photographic lineup was introduced at trial. According to Green, the prior inconsistent lineup could have been used to impeach the testimony of Kim Hallock identifying Green as the perpetrator, the police who conducted the lineup, and the investigative methods used in this case generally. Green further contends that the existence and use of the lineup also would have provided substantive evidence discrediting identification.
We conclude that trial counsel Parker was not ineffective in failing to maintain Green's file. As the trial court found, this issue arose when Green told Parker that the photo lineup introduced at trial did not look like the one that he saw during the suppression hearing when he was represented by Hammel. Hammel advised Parker that it appeared to be the same lineup and testified at the evidentiary hearing that he was not aware of any different lineup. Parker's performance was not defective for failing to maintain the file because it is unclear whether it ever contained a different photo lineup. For the same reason, it would be speculative to conclude that but for Parker's loss or destruction of the file, the outcome of the postconviction proceeding would have been different. Therefore, Green fails to prove *1104 both prongs of the Strickland standard. Maharaj v. State, 778 So.2d 944, 951 (Fla. 2000).

(2) Failure to Impeach Hallock
Green claims that defense counsel Parker rendered ineffective assistance in failing to impeach Kim Hallock at trial with a police report containing an alleged prior inconsistent statement that she, rather than Green, had been the one to tie Charles Flynn's hands. According to Green, Deputy Wade Walker stated in a report filed in 1999 pursuant to a Florida Department of Law Enforcement (FDLE) investigation that Hallock told him that the perpetrator made her tie Flynn's hands behind his back with a shoestring. Green argues that the information in the FDLE report contradicts Hallock's subsequent statements and trial testimony that Green himself tied Flynn's hands. However, Walker was not called to testify at the evidentiary hearing. Therefore, the trial court was left only with the allegations in Green's postconviction motion as to what Walker purportedly said in the FDLE report.
We affirm the trial court's denial of this claim because Green provided no supporting evidence to establish that Hallock actually made this statement to Walker. Furthermore, Parker was not ineffective for failing to impeach Hallock with this statement because Parker impeached Hallock with numerous other inconsistent statements. No prejudice resulted from counsel's failure to present cumulative evidence of inconsistent statements. See Arbelaez v. State, 898 So.2d 25, 42 (Fla.2005); Maharaj, 778 So.2d at 957.

(3) Failure to Impeach Jerome Murray
Additionally, Green claims that counsel was ineffective for failing to impeach a State's witness, Jerome Murray. Green argues that counsel should have obtained copies of Murray's three felony convictions and used them to impeach Murray. This claim is procedurally barred because it was neither raised in Green's 3.851 motion nor addressed by the trial court.

(4) Failure to Challenge a Prospective Juror
Green argues that defense counsel Parker was ineffective for failing to seek to have juror Guiles excused for cause or to peremptorily strike him because of a statement that he made during voir dire that his niece had been murdered three years earlier and for failing to ask follow-up questions. During voir dire, the following exchange took place:
The Court: Have any of you been the victim of a crime or has any member of your immediate family been the victim of a crime?
. . . .
Mr. Guiles: My niece was murdered, but that's not immediate family.
The Court: How long ago was that?
Mr. Guiles: Three years ago.
The Court: Three years ago?
Mr. Guiles: (Nods head.)
The Court: Where was it?
Mr. Guiles: In Naples.
The Court: Would you be able to set aside that?
Mr. Guiles: Well, it doesn't seem like it's the same kind of thing.
The Court: Would you be able to set it aside and not let it affect the case?
Mr. Guiles: Yes.
We affirm the trial court's denial of this claim because Green fails to meet both prongs of the Strickland standard. First, Green was not prejudiced by Parker's failure to remove Guiles for cause because the trial court inquired whether the murder of Guiles' niece would affect *1105 his decision in the case. Guiles said that it would not. Thus, Guiles met the test for juror competency enunciated in Davis v. State, 461 So.2d 67, 70 (Fla.1984) ("The test for determining juror competency is whether the juror can lay aside any bias or prejudice and render his verdict solely upon the evidence presented and the instructions on the law given . . . by the court."). Second, Parker did not render ineffective assistance in failing to ask Guiles more questions, because an allegation that there would have been a basis for a for cause challenge if counsel had followed up during voir dire with more specific questions is speculative. Johnson v. State, 903 So.2d 888, 896 (Fla.2005); Reaves v. State, 826 So.2d 932, 939 (Fla. 2002). Third, Parker's performance was not deficient for failing to exercise a peremptory strike to remove Guiles. At the evidentiary hearing, Parker testified that he was satisfied that juror Guiles would be able to follow the law regarding the weighing of the evidence and separate himself from the fact that his niece had been killed. This decision does not fall outside the wide range of professionally competent assistance. See Davis, 461 So.2d at 70.

D. Dog Tracking Evidence
Next, Green asserts that the trial court erred in denying relief with regard to dog tracking evidence. Specifically, Green argues: (1) that the State withheld impeaching dog track evidence in violation of Brady; (2) that the State affirmatively misled the jury to believe that no such evidence existed in violation of Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); (3) that counsel was ineffective for failing to discover and use dog tracking evidence for impeachment purposes; and (4) that counsel was ineffective for failing to retain an expert witness on dog tracking evidence. These claims are both procedurally barred and meritless.

(1) Procedural Bar
These issues are procedurally barred because they either were or should have been raised on direct appeal. See Miller v. State, 926 So.2d 1243, 1260 (Fla. 2006) ("[A] claim that could and should have been raised on direct appeal is procedurally barred.") (citing Davis v. State, 928 So.2d 1089, 1120 (Fla.2005), cert. dismissed, 547 U.S. 1053, 126 S.Ct. 1649, 164 L.Ed.2d 357 (2006), and cert. denied, ___ U.S. ___, 127 S.Ct. 206, 166 L.Ed.2d 166 (2006); Duckett v. State, 918 So.2d 224, 234 (Fla.2005), cert. denied, ___ U.S. ___, 127 S.Ct. 103, 166 L.Ed.2d 78 (2006); Robinson v. State, 913 So.2d 514, 524 n. 9 (Fla. 2005)). Proceedings under Florida Rule of Criminal Procedure 3.850 are not to be used as a second appeal. Medina v. State, 573 So.2d 293, 295 (Fla.1991) (citing State v. Bolender, 503 So.2d 1247 (Fla.1987)). Moreover, it is inappropriate to use a different argument to relitigate the same issue. Id. (citing Quince v. State, 477 So.2d 535 (Fla.1985)). Allegations of ineffective assistance cannot be used to circumvent the rule that postconviction proceedings cannot serve as a second appeal. Id. (citing Blanco v. Wainwright, 507 So.2d 1377 (Fla.1987); Sireci v. State, 469 So.2d 119 (Fla.1985)).
On direct appeal, Green argued that the trial court erred in admitting evidence of dog scent tracking. This Court summarized the facts related to the dog track evidence in Green's case as follows:
Within hours of the murder, a police dog tracked footprints from the dunes area to a house where Green's sister lived. The footprints at the dune area were never identified as Green's, but the trial judge admitted the scent-tracking evidence over defense objection because the character and dependability of the *1106 dog were established, the officer who handled the dog was trained, and the evidence was relevant. In addition, there were indicia of reliability: the tracking occurred within hours of the crime and the area had been secured shortly after the crime occurred, both of which greatly reduced the danger of a trail being left after the crime and a mistaken scent, and there was a continuous track to the home of Green's sister. The trial judge found that although the scent tracking was the only evidence that established Green's identity, corroboration included admissions by Green, Green's presence at the crime scene near the time of the crime, and Green's presence at his sister's house earlier that day.
Green v. State, 641 So.2d 391, 394 (Fla. 1994). We found that the trial court did not err in admitting evidence of dog scent tracking because a proper predicate for the admission of this evidence was established. Because the dog tracking issue was raised on direct appeal, Green is not permitted to relitigate it on postconviction appeal.

(2) Suppression of the Dog's Records
Green argues that the State withheld impeaching dog track evidence in violation of Brady. We conclude that there was no Brady violation because the training and certification performance records of the dog ("Czar") were available to defense counsel through the Criminal Justice Institute. Also, Deputy Kiser provided defense counsel with Czar's "Working Dog Training and Utilization Records," early on in the discovery process, along with the synopsis of those records created by Assistant State Attorney White in preparation for trial. Therefore, we affirm the trial court's denial of this claim.

(3) False Testimony
Next, Green claims that the State affirmatively misled the jury to believe that no such evidence existed in violation of Giglio. We affirm the trial court's denial of this claim. A claim under Giglio alleges that a prosecutor knowingly presented false testimony against the defendant. A Giglio violation is demonstrated when (1) the prosecutor presented or failed to correct false testimony; (2) the prosecutor knew the testimony was false; and (3) the false evidence was material. Guzman v. State, 941 So.2d 1045, 1050 (Fla.2006). Once the first two prongs are established, the false evidence is deemed material if there is any reasonable possibility that it could have affected the jury's verdict. Id. Under this standard, the State has the burden to prove that the false testimony was not material by demonstrating it was harmless beyond a reasonable doubt. Id. Giglio claims present mixed questions of law and fact. Sochor v. State, 883 So.2d 766, 785 (Fla.2004). We thus defer to those factual findings supported by competent, substantial evidence, but we review de novo the application of the law to the facts. Id.
Green argues that testimony elicited by Assistant State Attorney White from Deputy Kiser at trial to the effect that the dog, Czar, "had never made a mistake" constitutes a Giglio error. This claim lacks merit because no false testimony was elicited. The trial court found that the State did not elicit testimony at trial that Czar "never made a mistake." The State only established that Czar did not leave the test track and begin tracking a cross-track of a human or animal, while leading his handler to believe that he was on the original trail.

(4) Failure to Impeach the Dog's Abilities
Green claims that counsel was ineffective for failing to discover and use dog *1107 tracking evidence for impeachment purposes. However, counsel was not ineffective because the records do not contain substantive evidence with which to impeach the dog's abilities. Deputy Kiser testified at the evidentiary hearing that the reports note occasions that the dog refused to track, lost and regained a track, and missed turns but do not indicate that the dog erroneously followed a cross-track or indicated by his behavior that he was tracking a trail of several hundred yards when in fact he was off the trail and just acting like he was tracking. As Deputy Kiser and Bobby Mutter, the State's expert, testified, the dog's handler can tell by his behavior when the dog loses the scent. But there was no indication that Czar lost the scent in this case. Evidence was presented that the dog was tracking on a partly visible tennis shoe trail that led to the location of the victim Flynn's truck. The trial court determined that the visible tracks led from the area where Kiser started the dog (twenty yards off the road) to the area where the truck had been parked. Deputy Kiser scented the dog in a sandy open area where the visible tracks were remote from any other visible tracks and watched the dog follow those continuous tracks backwards until they could no longer be seen and on to the house where Green stayed. Because these records lack impeachment value, Green does not establish a reasonable probability that, but for counsel's failure to use them, the result of the proceeding would have been different. Accordingly, we affirm the trial court's finding that Green fails to show prejudice under Strickland.

(5) Failure to Consult With an Expert
Green argues that counsel was ineffective for failing to retain an expert witness on dog tracking evidence. Green contends that the expert could have reviewed the dog's training, certification, and track records to assist the defense. Also, Green claims that the expert could have established for the jury that the dog was old and his record showed many vital mistakes in tracking.
We affirm the trial court's denial of this claim because Green has not established the prejudice prong of the Strickland test. Green fails to show a reasonable probability that but for counsel's failure to consult with an expert, the result of the proceeding would have been different. The State's expert at the evidentiary hearing, Bobby Mutter, had more experience in training police dogs than the defense's expert, Dr. Warren James Woodford. Further, Mutter had personal knowledge of working with Deputy Kiser and Czar. While Dr. Woodford admitted that it was possible for a dog to follow the track that was done in this case even if not trained and certified in variable surface tracking, Mutter testified that all police trailing dogs do variable surface tracking and that the track in this case was elementary. The two experts testified oppositely on many factors such as the effect of dew on the ground, whether a six-hour-old trial is too old, whether Czar's training was adequate, and whether Czar was too old. The court found Mutter more credible. This finding is supported by competent, substantial evidence and is, therefore, entitled to deference. See Sims v. State, 967 So.2d 148, 32 Fla. L. Weekly S477 (Fla. July 12, 2007) ("When reviewing a trial court's ruling after an evidentiary hearing on an ineffective assistance claim, this Court gives deference to the trial court's factual findings to the extent they are supported by competent, substantial evidence. . . .") (quoting Morris v. State, 931 So.2d 821, 828 (Fla. 2006)). Therefore, we affirm the trial court's denial of this claim.

E. Jurors Interviews
Next, Green argues that the rules prohibiting his lawyers from interviewing *1108 jurors are unconstitutional. Green asserts this claim solely for the purpose of preserving it for review and, therefore, makes no supporting allegations. This Court has previously rejected constitutional challenges to Florida Rule of Professional Conduct 4-3.5(d)(4). See Power v. State, 886 So.2d 952, 957 (Fla.2004); State v. Duncan, 894 So.2d 817, 826 & n. 7 (Fla.2004); Johnson v. State, 804 So.2d 1218, 1224 (Fla.2001). Furthermore, "juror interviews are not permissible unless the moving party has made sworn allegations that, if true, would require the court to order a new trial because the alleged error was so fundamental and prejudicial as to vitiate the entire proceedings." Johnson, 804 So.2d at 1225 (citing Baptist Hospital of Miami, Inc. v. Maler, 579 So.2d 97, 100 (Fla.1991)). Accordingly, we affirm the trial court's denial of this claim.

F. Summarily Denied Claims

(1) Cross-Race Identification
Green claims that the trial court erred in summarily denying Green's ineffective assistance of counsel claim based on counsel's failure to challenge cross-race identification. Generally, "a defendant is entitled to an evidentiary hearing on a postconviction relief motion unless (1) the motion, files, and records in the case conclusively show that the prisoner is entitled to no relief, or (2) the motion or a particular claim is legally insufficient." Freeman v. State, 761 So.2d 1055, 1061 (Fla.2000); see also Fla. R.Crim. P. 3.850(d). Additionally, "where no evidentiary hearing is held below, we must accept the defendant's factual allegations to the extent they are not refuted by the record." Peede v. State, 748 So.2d 253, 257 (Fla. 1999).
Green claims that counsel should have retained an expert witness on cross-race identification, requested a special instruction, and cross-examined Hallock on her ability to identify African-American people. First, the record conclusively shows that Green is not entitled to relief based on his claim that counsel was ineffective for failing to retain an expert witness on cross-race identification. It is unlikely that such testimony would have been admitted. See Johnson v. State, 438 So.2d 774, 777 (1983) (holding that trial court did not abuse its discretion in refusing to allow a professor of psychology to testify as an expert witness in the field of eyewitness identification); see also McMullen v. State 714 So.2d 368, 372 (Fla.1998) ("Johnson could be interpreted as a per se rule of inadmissibility of this type of testimony.").
Second, Green's claim that counsel was ineffective for failing to request a jury instruction on cross-race identification is legally insufficient. Florida does not have a standard instruction on cross-race identification, and there is no reasonable probability that the result of the proceeding would have been different had such an instruction been given. Therefore, counsel's performance was not deficient for failing to request an instruction, and no prejudice resulted.
Third, the record conclusively shows that Green is entitled to no relief based on his claim regarding counsel's failure at trial to cross-examine Hallock on cross-race identification. At the suppression hearing, Parker cross-examined Hallock on her interactions with black people. Hallock testified that she knew and occasionally socialized with particular black people. Her testimony was neutral with regard to her ability to identify Green. Therefore, Parker's decision at trial not to cross-examine her again on this subject was not unreasonable. Accordingly, Parker's performance was not deficient under Strickland, and his failure to cross-examine *1109 Hallock at trial did not prejudice Green.

(2) Juror Misconduct
Green argues that the trial court erred in summarily denying his due process claims based on juror misconduct. During the guilt phase of Green's trial, defense counsel made a motion for mistrial based on juror misconduct. Tim Curtis, a witness for the State, testified that he saw an older gentleman in a burgundy Aerostar van in the parking lot. Curtis testified that he waved at the man, and in response, the man raised his hand to his throat and made a slashing motion. Curtis thought this man looked like one of the Green jurors. The court questioned jurors Guiles and Bartholomew about the type of vehicles they drove, but neither drove a burgundy Aerostar van. Curtis did not identify either Guiles or Bartholomew as the man he saw in the parking lot. Therefore, the trial court denied Green's motion for mistrial.
Then, On August 6, 1999, Tim Curtis signed a document titled "Affidavit" and witnessed by investigators Paul J. Ciolino and Joseph M. Mourna. This document states in pertinent part:
After I testified I was in the parking lot at the courthouse when a juror, a white male, made a slashing motion with his finger across his throat, indicating to me that Green was dead. I told a person the next day Green is dead knowing that a jury member had made up his mind to convict Crosley Green. The next day I was brought into court to identify the juror prior to the hearing[.] I had lunch with two detectives from the Sheriffs office who told me that if I identified this juror, there would be a mistrial and Crosley Green would go free. I lied at the hearing. I told the judge that I did not see the man who did this slashing motion in fact I did see the man and he was on the jury and in court the day. I have read and reviewed this statement and it is true to the best of my knowledge.
However, in his October 30, 2001, deposition, Curtis stated under oath that he did not write the statement. Curtis refused to answer any questions as to whether he signed the statement or whether he saw a juror making the slashing gesture and asserted his Fifth Amendment privilege against self-incrimination.
We affirm the trial court's denial of this claim. Green does not demonstrate how he can authenticate the writing allegedly written and signed by Tim Curtis recanting his former testimony that the man who made the slashing gesture was not on the jury. Curtis has invoked his Fifth Amendment privilege against self-incrimination, and jurors cannot be called to testify to matters that inhere to the verdict under section 90.607(2)(b), Florida Statutes (1987). Because this claim is legally insufficient, the trial court properly denied it without an evidentiary hearing. See Freeman v. State, 761 So.2d 1055, 1061 (Fla. 2000); see also Fla. R.Crim. P. 3.850(d).

III. THE STATE'S CROSS-APPEAL
On cross-appeal, the State maintains that the trial court erred in ordering a new penalty phase because Green's trial counsel was not ineffective in investigating his prior New York conviction. We first explain the factual background of this claim. We then discuss the United States Supreme Court's recent decision in Rompilla v. Beard, 545 U.S. 374, 377, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) (holding that counsel was ineffective for failing to make reasonable efforts to review the court file on the defendant's prior conviction). Finally, applying Rompilla and the Strickland standard to the facts of Green's case, we *1110 affirm the trial court's determination that counsel was ineffective in failing to investigate the case file in Green's prior New York case.

A. Facts
In its well-written order, the trial court made findings of fact that are supported by competent, substantial evidence in the record. During the penalty phase on September 27, 1990, the State presented testimony from three witnesses pertaining to the prior violent felony conviction. Arguing remoteness, defense counsel Parker moved to exclude evidence of the New York offense. The court denied that motion. During the penalty phase charge conference, Parker objected to the use of the New York offense to sustain the prior violent aggravator, stating:
I would argue that the previous felony involving violence because it was youthful offender status should not be considered in this circumstance. However, I make that argument knowing full well that [Campbell v. State, 571 So.2d 415, 418 (Fla.1990),] says there is no reason why you can't consider a juvenile conviction for a violent crime as an aggravating circumstance.
The court overruled that objection. After the jury returned an eight-to-four advisory recommendation for the death penalty, the court ordered a presentence investigation. The presentence investigation reported "JUVENILE RECORD: none ascertained." The presentence investigation listed under the Green's adult record an armed robbery from Albion, New York, indicating:
01/25/77 Adj. as youthful offender. Indeterminate sentence of 0-4 years to state prison. Parolled (sic) 1/26/78. A warrant for violation of parole was issued on 8/8/78. The defendant had been transferred to Florida and absconded while on supervision there.
In his sentencing memorandum, Parker specifically argued that the State failed to meet its burden of establishing the prior conviction aggravator beyond a reasonable doubt because it never introduced into evidence a certified copy of a judgment and sentence as to Green's prior conviction. At the Spencer-type hearing,[4] Parker further argued that, if the State proved the prior conviction aggravator beyond a reasonable doubt and that it was for a violent crime, the court still had to view it in light of the surrounding circumstances, including the age of the defendant at the time this particular crime allegedly occurred and the fact that he received youthful offender treatment in that regard.
In his postconviction motion, Green alleged that he had never been convicted of armed robbery in New York, that whatever conviction he did have was vacated, and that counsel was ineffective for failure to investigate and challenge this. An evidentiary hearing was held on this claim. The evidence showed that on January 19, 1977, Green pled guilty to "robbery in the third degree" in the State of New York. The robbery offense occurred in the County of Orleans in New York on April 18, 1976. At the time of committing the offense, Green was eighteen years old. On January 25, 1977, at the sentencing proceeding for that offense, Judge Hamilton Doherty pronounced the following sentence:
Well, the Court finds that you are eligible for youthful offender treatment, and the conviction of robbery in the third degree is vacated and the finding of youthful offender is made. That may *1111 not sound like any big deal, but what that does is relieve you of a criminal record. You now have no criminal record in spite of the fact that this was a serious crime.
. . . .
We're giving you that consideration because of your age. For your adjudication as a youthful offender, it's the judgment of this Court that you be, and you hereby are, sentenced to an indeterminate term not to exceed four years at the Elmira Reception  or an indeterminate term not to exceed four years under the supervision of the Department of Correctional Services of the State of New York, and you're to be delivered by the Sheriff of Orleans County to the Reception Center at Elmira, New York, there to be dealt with in accordance with the law relating to your sentence. You're to be given full time  full credit for the time you've already served. Remanded to the custody of the Sheriff. Mr. Green, you have a right to appeal from this judgment. If you intend to appeal, you should talk with Mr. Russelli about it. Your appeal  notice of appeal must be filed within thirty days.
At the evidentiary hearing in this case, Green's trial counsel testified that he made no efforts to verify the New York conviction by obtaining Green's court file from New York. Counsel testified that the reason he did not attempt to obtain the file was because Green admitted to committing the crime.

B. Rompilla

In a related case, the United States Supreme Court held that counsel was ineffective for failing to make reasonable efforts to review the court file on the defendant's prior conviction. See Rompilla, 545 U.S. at 377, 125 S.Ct. 2456. Applying the Strickland standard, the Supreme Court stated counsel's performance was deficient for several reasons. First, counsel knew that the prosecution intended to seek the death penalty by proving Rompilla had a significant history of felony convictions indicating the use or threat of violence. Second, the prior offense court file was readily available and relatively small. Third, the prior offense was similar to the crime charged. And fourth, there was a great risk that testimony about a similar violent crime would hamstring counsel's chosen defense of residual doubt. Id. at 383-86, 389-90, 125 S.Ct. 2456. The Supreme Court determined that counsel's lapse was prejudicial because "[i]f the defense lawyers had looked in the file on Rompilla's prior conviction, it is uncontested they would have found a range of mitigation leads that no other source had opened up." Id. at 390, 125 S.Ct. 2456. Based on this evidence, the Supreme Court concluded that counsel would have built a mitigation case rather than relying on residual doubt. Id. at 391, 125 S.Ct. 2456. The Supreme Court determined that the undiscovered mitigating evidence, taken as a whole, would likely have influenced the jury's appraisal of Rompilla's culpability. Therefore, the likelihood of a different result was sufficient to undermine confidence in the outcome. Id. at 376, 125 S.Ct. 2456.

C. Analysis
We affirm the trial court's decision ordering a new sentencing phase because counsel's deficient performance prejudiced Green's case. We discuss the application of the performance and prejudice prongs of the Strickland standard to the facts of this case in light of Rompilla.

(1) Performance
First, defense counsel Parker's performance was deficient. Parker knew that the State would submit evidence of the prior violent felony and that the prior case file was readily available, yet he failed to obtain and review the file. At the evidentiary *1112 hearing, Parker stated that he made no effort to obtain the New York file because Green admitted committing the crime. However, according to Rompilla, "even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial." 545 U.S. at 377, 125 S.Ct. 2456 (emphasis added). Therefore, regardless of Green's admission to counsel, under the facts of this case, failure to obtain the readily available New York file constitutes deficient performance.
The impact of this failure to obtain the New York file is amplified by the fact that Parker made no attempt to argue that under New York law, a youthful offender adjudication is not a "conviction" and, therefore, does not satisfy the prior violent felony conviction aggravator under Florida's death penalty statute. See § 921.141(5)(b), Fla. Stat. (1987).[5] We look both to Florida law and to the law of the state in which the adjudication was entered to determine whether the adjudication constitutes a conviction for purposes of the prior violent felony aggravator. See Merck v. State, 664 So.2d 939, 944 (Fla. 1995) (holding that an out-of-state juvenile adjudication is not a conviction as defined under North Carolina or Florida statutes) (citing § 921.141(5)(b), Fla. Stat. (1993); § 39.053, Fla. Stat. (1993); N.C. Gen.Stat. § 7A-638 (1993)). Under Florida's youthful offender statute,[6] youthful offender status appertains to the sentence rather than to the adjudication. If the trial court adjudicates the defendant guilty of the charged offense and orders a youthful offender sentence, *1113 then the adjudication counts as a conviction. However, no conviction results if the trial court withholds adjudication and sentences the defendant as a youthful offender. Thus, in Florida, youthful offender status does not bear on the issue of whether the adjudication constitutes a conviction.
By contrast, under New York law, a youthful offender adjudication is not a judgment of conviction. N.Y.Crim. Proc. Law §§ 720.10, .20, .35 (McKinney 1995 & Supp.2007); People v. Cook, 37 N.Y.2d 591, 376 N.Y.S.2d 110, 338 N.E.2d 619 (1975); Gold v. Gartenstein, 100 Misc.2d 253, 418 N.Y.S.2d 852 (Sup.Ct.1979); People v. Y.O. 2404, 57 Misc.2d 30, 291 N.Y.S.2d 510 (Sup.Ct.1968); People v. J.K., 137 Misc.2d 394, 520 N.Y.S.2d 986 (County Ct.1987). New York youthful offender adjudications comprise both a youthful offender finding and a youthful offender sentence.[7] In other words, unlike the Florida statute, a youthful offender designation in New York relates to the entire adjudication, not simply the sentence. Further, unlike the Florida statute, the New York statute directs courts to vacate the entire conviction and replace it with the youthful offender adjudication.[8] Thus, under New York law, Green's youthful offender adjudication is not a conviction and, therefore, does not support the prior violent felony conviction aggravator under section 921.141(5)(b).
Instead of arguing this important distinction, Parker made a general request that the court consider Green's youthful offender status, coupled with the caveat that "I make that argument knowing full well that [Campbell v. State, 571 So.2d 415, 418 (Fla.1990),] says there is no reason why you can't consider a juvenile conviction for a violent crime as an aggravating circumstance." Parker's statement evinces a failure to appreciate and argue the differences between a New York youthful offender adjudication and a juvenile conviction. Furthermore, neither Campbell nor any other Florida case has found a New York youthful offender adjudication to be a conviction for purposes of the prior violent felony aggravator.[9]
*1114 Finally, the New York case file contained some potentially mitigating information. The presentence investigation report indicated that Green was seventeen or eighteen when his father killed his mother and then killed himself. The report also questioned whether Green was actually involved in the New York crime or pled guilty to obtain release from custody. Other documents in the file showed that Green's codefendant's case was nolle prossequied for lack of evidence.

(2) Prejudice
With regard to prejudice, counsel's failure to obtain the New York file hindered Green's opportunity to contest the prior violent felony conviction aggravator. Had counsel reviewed the transcripts of Green's New York file, he would have learned that Green's youthful offender adjudication replaced the conviction under New York law. This argument would have defeated the prior violent felony aggravator because, as stated above, New York law determines that a youthful offender adjudication is not a conviction. See Merck, 664 So.2d at 944.[10]
In addition, Parker's failure to obtain the New York file prejudiced Green because it could have been used to clear up the confusion over whether Green was convicted of "armed" robbery or simple robbery. According to the trial court, two witnesses testified that Green was convicted of a prior "armed" robbery, and the judge, in his order, made a finding that Green was convicted of "armed" robbery. As the postconviction trial court accurately noted, "[t]he fact that the [penalty phase] jury was left with the false impression that [Green] had been convicted of a prior offense in which he robbed someone with a firearm similar in nature to the crime charged in this case is highly prejudicial." As the postconviction trial court found, a prior conviction for armed robbery carries more weight in aggravation than a prior conviction for simple robbery because it implies that Green was armed with a deadly weapon and threatened immediate use of a dangerous instrument. See N.Y. Penal Law § 160.15 (McKinney 1999). Further, in this case, a prior armed robbery is more aggravating than simple robbery because the murder of Charles Flynn also took place in the course of an armed robbery. Therefore, there is a reasonable probability that but for counsel's errors, the trial court would have found insufficient aggravation to warrant imposition of the death penalty.
Because Green was prejudiced by Parker's deficiency in failing to obtain and review the New York file, we affirm the trial court's granting of a new sentencing proceeding.

IV. THE HABEAS PETITION
Green raises four claims in his petition for writ of habeas corpus. First, Green *1115 claims that his counsel on direct appeal was ineffective for failing to raise the trial court's error in finding that the State had established the prior violent felony aggravator. Second, Green claims that the death penalty is disproportionate. Third, Green asserts that execution by lethal injection is cruel and unusual punishment. Fourth, Green argues that his Eighth Amendment right against cruel and unusual punishment will be violated as he may be incompetent at the time of execution. We address each of these claims in turn.

A. Ineffective Assistance of Appellate Counsel
Green alleges that appellate counsel provided ineffective assistance of counsel for failing to raise the trial court's error in finding that the State had established the prior violent felony aggravator. This claim raises essentially the same issue with regard to Green's prior New York youthful offender adjudication that was raised in his postconviction appeal and the State's cross-appeal. Habeas corpus is not to be used for additional appeals of issues that could have been or were raised on appeal or in other postconviction motions. Mills v. Dugger, 559 So.2d 578, 579 (Fla. 1990) (citing Suarez v. Dugger, 527 So.2d 190 (Fla.1988); White v. Dugger, 511 So.2d 554 (Fla.1987); Blanco v. Wainwright, 507 So.2d 1377 (Fla.1987)). Therefore, this claim is procedurally barred.

B. Proportionality
Under claim two of his petition for writ of habeas corpus, Green alleges that the death penalty is disproportionate and that this case should be returned to the lower court for imposition of a life sentence. On direct appeal, we held that Green's sentence was proportionate. Green argues that this Court should revisit its original proportionality review on postconviction review based on newly discovered evidence. However, Green does not present any newly discovered evidence which would warrant a proportionality reevaluation. Therefore, this claim is denied.

C. Lethal Injection
Under claim three of his petition for writ of habeas corpus, Green contends that execution by lethal injection is cruel and unusual punishment under the Eighth and Fourteenth Amendments of the United States Constitution and under the Florida Constitution. We deny habeas relief based on Diaz v. State, 945 So.2d 1136 (Fla.), cert. denied, ___ U.S. ___, 127 S.Ct. 850, 166 L.Ed.2d 679 (2006). The numerous decisions relied on in Diaz addressed the precise issues raised by Green in his motion. See Sims v. State, 754 So.2d 657, 668 (Fla.2000) (holding that execution by lethal injection is not cruel and unusual punishment); Provenzano v. State, 761 So.2d 1097, 1099 (Fla.2000); Johnson v. State, 904 So.2d 400, 412 (Fla. 2005); Robinson v. State, 913 So.2d 514 (Fla.2005); see also Lightbourne v. McCollum, 969 So.2d 326, 32 Fla. L. Weekly S687 (Fla. Nov. 1, 2007) (holding that Florida's current lethal injection procedures, as actually administered through the Department of Corrections, do not violate the Eighth Amendment of the United States Constitution).

D. Green May Be Incompetent at the Time of Execution
Finally, under claim four of his petition for writ of habeas corpus, Green argues that his Eighth Amendment right against cruel and unusual punishment will be violated as he may be incompetent at time of execution. We deny this claim because it is not ripe for consideration at this time. See Thompson v. State, 759 So.2d 650, 668 (Fla.2000); Provenzano v. State, 751 So.2d 37 (Fla.1999); Fla. R.Crim. P. 3.811(d). This claim is premature because a claim of incompetency to be *1116 executed cannot be asserted until a death warrant has been issued, and no death warrant has been issued in this case. Davis v. State, 875 So.2d 359, 374 n. 9 (Fla.2003); Phillips v. State, 894 So.2d 28, 36 (Fla.2004).

V. CONCLUSION
We affirm the trial court's order upholding Green's first-degree murder conviction and granting a new penalty phase because counsel was ineffective for failing to investigate Green's prior New York robbery case. We deny Green's petition for writ of habeas corpus.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const.
[2] Green raised nine issues on direct appeal: (1) the trial court erred in admitting evidence of dog scent tracking; (2) the trial court erred in denying Green's motion to suppress Kim Hallock's identifications; (3) the trial court erred in denying Green's motion for the jury to view the murder scene; (4) the trial court erred in instructing the jury on flight; (5) the trial court erred in considering as separate aggravating circumstances that Green committed the murder for pecuniary gain and that Green committed the murder during a kidnapping; (6) the trial court erred in finding that the murder was heinous, atrocious, or cruel; (7) the trial court improperly refused to find mitigating circumstances; (8) the death penalty is disproportionate; and (9) the heinous, atrocious, or cruel aggravator is unconstitutionally vague. Green, 641 So.2d at 394 n. 1. We found no merit in the first five issues. As to the sixth issue, we struck the heinous, atrocious, or cruel aggravator, but found that the error was harmless given the other three aggravating factors. Id. at 396. With regard to the seventh issue, we agreed that, although the sentencing order did not strictly comply with Campbell v. State, 571 So.2d 415, 420 (Fla. 1990), receded from on other grounds by Trease v. State, 768 So.2d 1050, 1055 (Fla.2000), its requirements were met anyway. See Green, 641 So.2d at 396 n. 3. Finally, under the eighth issue, we found that, "in light of other cases, the three remaining valid aggravating circumstances, and no mitigators, . . . Green's death sentence is proportionate." Id. at 396.
[3] Green claimed the following: (1) juror misconduct; (2) unconstitutionality of the rules prohibiting juror interviews; (3) ineffective assistance of counsel; (4) suppression of evidence; (5) presentation of false or misleading testimony; (6) newly discovered evidence negating guilt; (7) various issues relating to Green's prior New York offense; (8) various issues regarding dog tracking evidence; (9) unconstitutionality of Florida's application of its death penalty statute; (10) unconstitutionality of penalty phase jury instructions; (11) cruel and unusual punishment; and (12) cumulative error.
[4] Spencer v. State, 615 So.2d 688 (Fla. 1993), had not been decided at the time of Green's sentencing procedure; however, the trial judge used a comparable procedure by having oral arguments on the aggravating and mitigating circumstances on November 7, 1990.
[5] Under section 921.141(5)(b), Florida Statutes (1987), the prior violent felony conviction aggravator is established if the State proves, beyond a reasonable doubt, that "[t]he defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person." (Emphasis added.)
[6] Section 958.03(5), Florida Statutes (2006), defines "youthful offender" as "any person who is sentenced as such by the court or is classified as such by the department pursuant to s. 958.04." Further, trial judges have discretion under section 985.565(4)(a)(2), Florida Statutes (2006), to sentence defendants who qualify as youthful offenders either as adults, as youthful offenders, or as juveniles:

If a child who has been transferred for criminal prosecution pursuant to information or waiver of juvenile court jurisdiction is found to have committed a violation of state law or a lesser included offense for which he or she was charged as a part of the criminal episode, the court may sentence as follows:
a. As an adult;
b. [As a youthful offender u]nder chapter 958; or
c. As a juvenile under this section.
Further, section 958.04(2) states:
In lieu of other criminal penalties authorized by law and notwithstanding any imposition of consecutive sentences, the court shall dispose of the criminal case as follows:
(a) The court may place a youthful offender under supervision on probation or in a community control program, with or without an adjudication of guilt, under such conditions as the court may lawfully impose for a period of not more than 6 years. . . .
(b) The court may impose a period of incarceration as a condition of probation or community control. . . .
(c) The court may impose a split sentence whereby the youthful offender is to be placed on probation or community control upon completion of any specified period of incarceration. . . .
(d) The court may commit the youthful offender to the custody of the department for a period of not more than 6 years, provided that any such commitment shall not exceed the maximum sentence for the offense for which the youthful offender has been convicted.
(Emphasis added.)
[7] New York Criminal Procedure Law section 720.10 includes the following definitions:

4. "Youthful offender finding" means a finding, substituted for the conviction of an eligible youth, pursuant to a determination that the eligible youth is a youthful offender.
5. "Youthful offender sentence" means the sentence imposed upon a youthful offender finding.
6. "Youthful offender adjudication". A youthful offender adjudication is comprised of a youthful offender finding and the youthful offender sentence imposed thereon and is completed by imposition and entry of the youthful offender sentence.
[8] Section 720.20, New York Criminal Procedure Law, states that:

1. Upon conviction of an eligible youth, the court must order a pre-sentence investigation of the defendant. After receipt of a written report of the investigation and at the time of pronouncing sentence the court must determine whether or not the eligible youth is a youthful offender. . . .
3. Upon determining that an eligible youth is a youthful offender, the court must direct that the conviction be deemed vacated and replaced by a youthful offender finding; and the court must sentence the defendant pursuant to section 60.02 of the penal law.
(Emphasis added.)
[9] Campbell is inapplicable to this case. In Campbell, we held that a juvenile conviction supported the prior violent felony aggravator. We stated that "[t]he court correctly found that Campbell was previously convicted of a felony involving the use or threat of violence. He cites no authority in support of his assertion that prior juvenile convictions cannot be considered in aggravation." Id. That case involved a prior juvenile conviction, rather than a youthful offender adjudication. In Merck, we held that an out-of-state juvenile adjudication is not a conviction as defined under North Carolina or Florida statutes. 664 So.2d at 944 (citing § 921.141(5)(b), Fla. Stat. (1993); N.C. Gen.Stat. § 7A-638 (1993)). We distinguished Campbell, stating that Campbell involved juvenile "convictions" rather than delinquency "adjudications." We explained:

Our decision in this case is not to be read to mean that "convictions" of individuals who are juveniles which otherwise come within section 921.141(5)(b) are eliminated from consideration because the individuals are juveniles. Rather, our decision applies only to adjudications of delinquency which by statute are not convictions.
Merck, 664 So.2d at 944.
[10] This also prejudiced Green because we struck the heinous, atrocious, or cruel aggravator on direct appeal. If it had been challenged, we would have struck the prior conviction aggravator, leaving only two aggravators to support Green's death sentence: (1) committed for pecuniary gain; and (2) committed in the course of a kidnapping. Without the prior violent felony aggravator, we would have found Green's death sentence to be disproportionate and reversed for resentencing.