# Supreme Court of Florida

_____

No. SC17-1623
_____

**MARGARET A. ALLEN,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

December 20, 2018

PER CURIAM.

Margaret Allen, a prisoner under sentence of death, appeals an order denying her motion for postconviction relief filed under Florida Rule of Criminal Procedure 3.851.  We have jurisdiction.  *See* art. V, § 3(b)(1), Fla. Const.  For the reasons that follow, we affirm the circuit court's order denying Allen's motion for postconviction relief.

## BACKGROUND

In 2010, Allen was convicted of the kidnapping and first-degree murder of Wenda Wright.  *Allen v. State*, 137 So. 3d 946, 953 (Fla. 2013).  On direct appeal,

we affirmed her convictions and sentences, including a sentence of death for the

murder, and summarized the guilt-phase evidence as follows:

> Johnny [Dublin, Wenda Wright's domestic partner], testified that on the day Wright went missing, Allen came to Dublin and Wright's house and whispered something into Wright's ear. In response, Wright and Allen left the house together. A little while later, Allen returned to Dublin's house and told Dublin that Wright stole about $2000 of Allen's money and Allen asked Dublin if she could search his house. Dublin obliged and Allen searched Dublin's house. Dublin testified that he noticed that Allen had scratches on her when she came back to his house. Dublin asked Allen where Wright was, and Allen responded that she was still at Allen's house. Dublin testified that the next day, Allen came back to his house and asked him where Wright was. Dublin testified that Quintin [Allen, a neighbor and friend of Allen] was with Allen. Quintin . . . testified for the State . . . that he was at Allen's house on the day of the murder when Allen noticed that her purse was missing. Allen left her house, . . . returned . . . with Wright and asked Quintin to come inside. Allen told Quintin that Wright must have stolen Allen's purse because Wright was the only person at Allen's house before the purse went missing. Allen and Quintin searched for the purse. Allen left the house again and told Quintin not to let Wright leave if she tried. At one point while Allen was gone, Wright tried to leave; Quintin told Wright that Allen wanted her to stay, and Wright obliged.

> Upon Allen's return, Quintin plaited Allen's hair. Quintin testified that at one point Wright started crying and begged Allen to let her go home. Wright attempted to leave Allen's house and Allen hit Wright on the head; Wright fell to the ground. Quintin testified that Allen had a gun and told him that if he did not help her with Wright, she would shoot him, so Quintin held Wright down on the floor. While he held Wright down, Allen found chemicals including bleach, fingernail polish remover, rubbing alcohol and hair spritz and poured them all onto Wright's face. At one point, one of Allen's children walked into the room in which this was taking place, and Allen told the child to rip off a piece of duct tape for Allen. Allen attempted to put the duct tape over Wright's mouth, but because Wright's face was wet from the chemicals that were poured on her

- 2 -

face, the duct tape would not stick to her skin. Allen retrieved belts from her closet and beat Wright with them. Quintin then tied Wright's feet together with one of the belts. Quintin testified that at that point Wright was not struggling. Allen then put one of the belts around Wright's neck and pulled. At one point, Wright said, "Please, stop. Please stop. I am going to piss myself." Wright's body started shaking and after about three minutes, Wright did not move. Allen then told Quintin to get some sheets to tie Wright's hands together in case Wright woke up.

Quintin left soon after the incident. Allen called Quintin throughout the night, but he did not answer her calls. The next day, Allen found Quintin at the barbershop. Quintin testified that Allen still had the gun. Quintin got into the truck that Allen was driving; James Martin [a friend of Allen] was also in the truck. Allen told Quintin that Wright was dead. Allen then told Quintin that he had to help her get rid of the body. Allen, Quintin, and Martin drove to Lowe's to buy plywood to help move Wright's body from inside the house into the truck. They also borrowed a dolly hand truck from a local shop to help move the body. Quintin testified that upon returning to Allen's house, Wright's body had been moved from where he had last seen her and had been wrapped in Allen's carpet. They were eventually able to get Wright's body into the truck. Then, all three took shovels from Allen's mother's tool shed and drove to an area off of the highway to dump Wright's body. Quintin and Martin dug a hole while Allen stood as a lookout. They placed Wright's body in the hole, covered the hole with debris, and took the carpet with them. They threw the carpet into a dumpster outside of a truck stop and picked up Allen's daughter from school. Quintin went to the police and turned himself in. Quintin also took the police to the place where Wright's body had been buried.

James Martin testified . . . that on the day of the murder, he was at Allen's house helping her repair a car. Allen asked Martin to help her search for her purse, and Martin did. He testified that he left Allen's house around 10 p.m. to get a starter belt for the car. Martin finished repairing the car and asked Allen if she had any cocaine. She did not, so Martin left Allen's house, found cocaine, came back to Allen's house, and smoked it. Martin testified that when he got back from finding the cocaine, Wright was the only one at Allen's house.

Martin testified that the timing of the events of the day was unclear because he had been high. Martin testified that he slept at Allen's house until the morning and got a ride from Allen when she took her children to school. At that point, Allen told Martin that she needed help. Allen and Martin went back to Allen's house, and Martin saw Wright's body. Martin testified that Allen told him, "He must have hit her too hard." Martin testified that he noticed a bandana tied around Wright's hands. Allen told Martin that they had to bury Wright's body. Allen sent Martin to Allen's brother's house to borrow a truck. Martin testified that the truck was never found by police. Martin testified that the entire plan, including getting the plywood at Lowe's was Allen's idea. Martin testified that he was the only smoker of the group, and he dumped all of the ashtrays out of the car after they buried the body. When they got back to Allen's house, Quintin left, and Martin cleaned the nylon strap that had been used to secure the carpet around Wright's body. Martin also washed the truck but testified that he did not know what became of the vehicle. Martin was at Allen's house when the police came to Allen's house with a search warrant.

        . . . .

        Denise Fitzgerald, a crime scene technician, testified that she exhumed Wright's body and located a cigarette butt in the vicinity. The State and defense stipulated that the DNA found on the cigarette butt was consistent with Martin's DNA. Dr. Sajid Qaiser, a forensic pathologist and chief medical examiner for Brevard County, testified that . . . a body cannot bruise once dead and that Wright had bruising in the following places: upper and lower eye lid, front and back of her ear, left torso, all over the left side, trunk, right hand, thigh, knee, left eyebrow, forehead, upper arm and shoulder area. Additionally, Wright's chest, hands, torso, face, and lower lip had contusions. Wright's wrist showed signs of ligation, meaning her hands were tied. Wright's neck showed signs of ligation, meaning that she was either hung or something was tied tightly around her neck. Dr. Qaiser testified that his medical conclusion was that Wright's death was the result of homicidal violence, and strangulation and ligature were an important cause of death. Dr. Qaiser testified that Wright was morbidly obese, with an enlarged heart, which contributed to her death. He testified that it would take from four to six minutes of strangulation to die. He could not tell whether she was rendered unconscious during the beating.

*Id.* at 951-53. The record also shows that while the autopsy report concluded that cocaine intoxication was a cause of Wright's death, Dr. Qaiser testified that he did not agree with the conclusion.

After convicting Allen of kidnapping and first-degree murder, Allen's jury unanimously recommended a death sentence. The trial court followed the jury's recommendation, finding two aggravators[1] and four nonstatutory mitigating circumstances.[2] On appeal, this Court affirmed the death sentence. *Id.* at 969. Allen's death sentence became final in 2014. *Allen v. Florida*, 135 S. Ct. 362 (2014).

Thereafter, Allen timely filed her initial motion for postconviction relief under Florida Rule of Criminal Procedure 3.851, raising fourteen claims with subparts. Allen sought leave to amend her rule 3.851 motion to add a *Hurst v.*

---

1. The trial court found the following aggravators: (1) the capital felony was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit, or flight after committing or attempting to commit a kidnapping (great weight); and (2) the capital felony was especially heinous, atrocious, or cruel (great weight). *Id.* at 955.

2. The mitigating circumstances found were the following: (1) Allen was the victim of physical abuse and possible sexual abuse in the past (some weight); (2) Allen has brain damage as a result of prior acts of physical abuse and the brain damage results in episodes of lack of impulse control (some weight); (3) Allen grew up in a neighborhood where there were acts of violence and illegal drugs (some weight); and (4) Allen helped people in her life (little weight). *Id.*

*Florida* claim and a *Hurst v. State* claim.[3]  The postconviction court accepted the

amendments and held an evidentiary hearing on the fourteen claims.[4]  The trial

---

3.  *Hurst v. Florida*, 136 S. Ct. 616 (2016); *Hurst v. State*, 202 So. 3d 40 (Fla. 2016), *cert. denied* 137 S. Ct. 2161 (2017).

4.  Allen raised the following claims in her amended rule 3.851 motion: (1) trial counsel was ineffective for failing to strike juror Carll for cause or peremptorily; (2) trial counsel was ineffective for failing to properly impeach former-codefendant-turned-State-witness Quintin's testimony with his prior inconsistent statement indicating that Allen poured chemicals on the victim; (3) trial counsel was ineffective in eliciting improper testimony on cross-examination of Quintin; (4) trial counsel was ineffective for failing to impeach Quintin with prior inconsistent statements and for failing to cross-examine Quintin about his statement regarding his possession of $4,000 two days after the victim's death; (5) trial counsel was ineffective for failing to object to prosecutorial misconduct in the guilt phase closing arguments; (6.1) trial counsel was ineffective in failing to object that the prosecutor misrepresented evidence and testified to facts not in evidence in the guilt phase closing arguments; (6.2) trial counsel was ineffective in failing to object and request a curative instruction when the prosecutor misrepresented Dr. Qaiser's testimony regarding the time it takes for strangulation to lead to death; (6.3) trial counsel was ineffective in failing to object when the prosecutor misrepresented Dr. Qaiser's testimony regarding evidence of petechia on the victim; (6.4) trial counsel was ineffective in failing to object and request a curative instruction when the prosecutor read from the autopsy report and misrepresented its findings during the guilt phase closing argument; (6.5) trial counsel was ineffective in failing to object when the prosecutor misstated the elements of first-degree felony murder; and (6.6) the cumulative effects of the errors in counsel's performance constituted prejudice for Allen; (7) trial counsel was ineffective in failing to object to Dr. Qaiser's testimony that unconscious people can feel pain; (8.1) trial counsel was ineffective during the penalty phase for failing to object and move for a mistrial on the ground that the prosecutor presented information about Allen's drug convictions as an inadmissible nonstatutory aggravator; (8.2) trial counsel was ineffective during the penalty phase for failing to object and move for a mistrial on the ground that the prosecutor argued lack of remorse during cross-examination of Dr. Wu; (8.3) trial counsel was ineffective during the penalty phase for failing to object and move for a mistrial on the ground that the prosecutor twice referenced Allen's future dangerousness; (8.4)

trial counsel was ineffective during the penalty phase for failing to object and move for a mistrial on the ground that the prosecutor presented information about Allen's time in prison as an inadmissible nonstatutory aggravator; (8.5) trial counsel was ineffective during the penalty phase for failing to object and move for a mistrial on the ground that the prosecutor analogized pouring liquid on the victim's face to waterboarding; (8.6) trial counsel was ineffective during the penalty phase closing argument for failing to object on the ground that the prosecutor made an improper golden rule argument; (8.7) trial counsel was ineffective during the penalty phase closing argument for failing to object on the ground that the prosecutor made an improper golden rule argument; (8.8) trial counsel was ineffective during the penalty phase closing argument for failing to object and move for a mistrial on the grounds that the prosecutor added to the authority of his office and misstated evidence; (8.9) trial counsel was ineffective during the penalty phase closing argument for failing to object and move for a mistrial on the ground that the prosecutor denigrated Dr. Gebel's testimony and misrepresented it; (8.10) trial counsel was ineffective during the penalty phase closing argument for failing to object and move for a curative instruction on the ground that the prosecutor misstated the evidence presented by Dr. Wu; (8.11) trial counsel was ineffective during the penalty phase closing argument for failing to object and move for a mistrial on the ground that the prosecutor introduced evidence of bad character; (8.12) trial counsel was ineffective during the penalty phase closing argument for failing to object and move for a mistrial on the grounds that the prosecutor attempted to gain sympathy and cloaked the State's case with legitimacy as a death case; (8.13) the cumulative effects of the errors in counsel's performance constituted prejudice for Allen; (9) trial counsel was ineffective in questioning Allen's aunt about the culture of "drugs, thugs, and violence," which opened the door to other questions about Allen's participation in that environment; (10) the State committed a *Giglio v. United States*, 405 U.S. 150 (1972), violation in the penalty phase by eliciting and failing to correct false testimony that Allen was convicted several times for selling drugs; (11) trial counsel was ineffective in failing to acquire and present expert witness testimony to refute and clarify Dr. Qaiser's testimony; (12) trial counsel was ineffective in failing to elicit testimony from Dr. Wu about two statutory mitigators; (13) trial counsel was ineffective in failing to investigate and present mitigation testimony; and (14) trial counsel was ineffective in failing to call Quintin at the penalty phase to testify to Allen's demeanor at the time of the offenses.

court denied the motion in its entirety, including summarily denying the *Hurst v. Florida* and the *Hurst v. State* claims.

Allen appealed the denial of her rule 3.851 motion, arguing that the postconviction court erred with respect to the following claims: (1) that trial counsel was ineffective for failing to object to improper prosecutorial comments and misstatements and for failing to move for a mistrial during guilt phase closings; (2) that trial counsel was ineffective for failing to investigate and present certain mitigation evidence; (3) that trial counsel was ineffective for eliciting testimony from former-codefendant-turned-State-witness Quintin that Allen poured chemicals on the victim; (4) that trial counsel was ineffective for failing to object to Dr. Qaiser's testimony that unconscious people feel pain; (5) that trial counsel was ineffective for failing to object and move for a mistrial during penalty phase closings based on prosecutorial misconduct; (6) that trial counsel was ineffective for asking if Allen became a part of the culture of "drugs, thugs, and violence"; (7) that trial counsel was ineffective for failing to call his own forensic expert; (8) that trial counsel was ineffective for failing to impeach Quintin with prior inconsistent statements; (9) that trial counsel was ineffective for failing to adequately challenge or strike a juror during voir dire; (10) that the State committed a *Giglio* violation by eliciting and failing to correct false testimony that

Allen was convicted several times for selling drugs; and (11) that Allen is entitled to a new penalty phase under *Hurst v. Florida* and *Hurst v. State*.

## ANALYSIS

Allen argues that the circuit court erred in denying eleven claims in her postconviction motion. Nine of the claims allege ineffective assistance of counsel—one pertaining to the guilt phase, five to the penalty phase, two to both phases, and one to jury selection; the tenth claim alleges a *Giglio* violation; and the final claim alleges a *Hurst* error. We address each claim in turn.

## I. Ineffective Assistance of Counsel

Allen first argues that her trial counsel was ineffective. Claims of ineffective assistance of counsel are analyzed in accordance with *Strickland v. Washington*, 466 U.S. 668 (1984). To be entitled to relief, the defendant must establish the following two prongs, deficient performance and prejudice:

> First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined.

*Peterson v. State*, 221 So. 3d 571, 583 (Fla. 2017) (quoting *Schoenwetter v. State*, 46 So. 3d 535, 546 (Fla. 2010)).

To establish the *Strickland* deficiency prong, "the defendant must demonstrate that counsel's performance was unreasonable under 'prevailing

- 9 -

professional norms.' " *Id.* at 583-84 (quoting *Strickland*, 466 U.S. at 688).  There is a strong presumption that counsel's performance was not ineffective.  *See Strickland*, 466 U.S. at 690.  "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  *Id.* at 689.  Moreover, counsel's "strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct."  *Occhicone v. State*, 768 So. 2d 1037, 1048 (Fla. 2000).

The *Strickland* prejudice prong requires the defendant to show that "there is a reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been different," where "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.  Specifically for claims of ineffective assistance of counsel during the penalty phase, a defendant must show that, absent the errors, "the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death," *id.* at 695, meaning that counsel's ineffectiveness "deprived the defendant of a reliable penalty phase proceeding," *Hoskins v. State*, 75 So. 3d 250, 254 (Fla. 2011).

Further, "because the *Strickland* standard requires establishment of both prongs, when a defendant fails to make a showing as to one prong, it is not necessary to delve into whether he has made a showing as to the other prong." *Waterhouse v. State*, 792 So. 2d 1176, 1182 (Fla. 2001). We review the postconviction court's factual findings for competent, substantial evidence, while reviewing its ultimate conclusions on both prongs de novo. *See Peterson*, 221 So. 3d at 584. We affirm the postconviction court's denial on the merits of Allen's nine ineffective assistance of counsel claims as set forth below.

### 1. Failure to object to improper prosecutorial comments and misstatements and to move for a mistrial during guilt phase closing arguments

Allen argues that her trial counsel was ineffective for failing to move for a mistrial and object to the prosecutor's improper comments during the guilt phase closing arguments.

<u>Subclaim 1</u>

Allen first claims that trial counsel should have objected and requested a curative instruction when the prosecutor misstated that, to prove first-degree felony murder, the State only needed to prove that Wright died during the kidnapping, not how she died.

The record shows that the prosecutor stated during closing argument, "All we have to prove is that during the course of the kidnapping she died. And it doesn't matter how." However, earlier in the argument, the prosecutor also

- 11 -

accurately described each of the elements of first-degree felony murder, which includes proving that the death occurred as a consequence of the kidnapping. The State also correctly presented the elements of first-degree felony murder on a visual display to the jury, and the elements were contained in the jury instructions.

Allen argues that counsel's performance prejudiced her jury by influencing them to believe that Allen could still be guilty of felony murder even if the cocaine intoxication, and not the strangulation, caused Wright's death. However, Allen has failed to demonstrate prejudice, considering the totality of the correct descriptions of the elements of felony murder available to the jury. *See Carratelli v. State*, 961 So. 2d 312, 324 (Fla. 2007) ("Under *Strickland*, to demonstrate prejudice a defendant must show that there is a reasonable probability—one sufficient to undermine confidence in the outcome—that, but for counsel's unprofessional errors, the result of the proceeding would have been different.") (citing *Strickland*, 466 U.S. at 694). There is no reasonable probability that, but for counsel's failure to object, the outcome would have been different. Our confidence in the outcome is not undermined. Because Allen has failed to establish the prejudice prong, we need not address deficiency. *See Strickland*, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."). Therefore, we conclude that the trial court properly denied postconviction relief on this claim.

Subclaim 2

Allen claims that trial counsel should have objected when the prosecutor mentioned his distaste for plea bargaining with codefendants and indicated that Allen was more culpable than Quintin. Allen also claims that counsel should have objected when the prosecutor denied that evidence of a plea offer to Allen existed, and that counsel should have requested that the jury be instructed about the plea offer discussions that took place. However, this claim was not raised in Allen's postconviction motion before the circuit court. It therefore was not preserved for review. "In order to preserve an issue for appeal, the issue 'must be presented to the lower court and the specific legal argument or grounds to be argued on appeal must be part of that presentation.' " *Bryant v. State*, 901 So. 2d 810, 822 (Fla. 2015) (quoting *Archer v. State*, 613 So. 2d 446, 448 (Fla. 1993)). Allen has waived the claim, and it is therefore procedurally barred. In any event, the claim is without merit because Allen has failed to establish prejudice. There is not a reasonable probability that, but for counsel's failure to object, the outcome would have been different. Allen is therefore not entitled to relief on the merits.

Subclaim 3

Allen claims that trial counsel should have objected when the prosecutor stated that petechia results from a tight strangulation. Allen argues that counsel's

deficient performance prejudiced her jury because it reduced doubt in the jury members' minds that strangulation actually occurred.

The record shows that in the guilt phase closing argument, the prosecutor stated that "[Allen] is the one holding that belt around her neck so tightly that it would even cause petechia, the little pinpoint blood vessels that pop in your eyes. Okay? So tight that Dr. Qaiser said that you don't get it unless it is held real tight." On cross-examination, Dr. Qaiser testified that "whenever the strangulation is complete and really tight, you won't see petechia" and noted that he "did not see" evidence of petechia in the autopsy photographs.

Allen has failed to demonstrate that counsel's failure to object to the prosecutor's misstatement prejudiced her. The evidence presented at trial showed that Wright was tortured, bound, and strangled by Allen. Whether petechia occurred from the strangulation of Wright does not weaken the evidence made available to the jury. Further, the jury heard from Dr. Qaiser that petechia does not occur during a tight strangulation, and that the autopsy photos did not reveal that petechia occurred. In light of this, there is no reasonable probability that, but for counsel's failure to object, the outcome would have been different. Our confidence in the outcome is not undermined. Because Allen has not demonstrated prejudice, we need not address the deficient performance prong. *See Strickland*,

- 14 -

466 U.S. at 697. Therefore, we conclude that the circuit court properly denied relief on this claim.

Subclaim 4

Allen argues that trial counsel should have objected when the prosecutor stated that it takes "three or four minutes" to die of strangulation.

The record shows that during the State's direct examination, Dr. Qaiser testified in response to the question, "How long does it take a person to strangle – to die from strangulation?" that "[w]ithin four to six minutes only a person can die." Quintin testified at trial that Allen held the belt "around [Wright's] neck for three minutes," and that Wright stopped moving after three minutes. In the guilt phase closing argument, the prosecutor made the following statement: "[Y]ou can take this for discussion, that placing a rope around someone's neck and holding it there for three or four minutes, because that is what Dr. Qaiser said it would take, okay, three or four minutes, all right, that may have some aspects of premeditation here."

Allen has failed to demonstrate prejudice. The prosecutor's statement that it takes "three or four" minutes to die of strangulation was not wholly inconsistent with the evidence presented at trial that it takes "four to six minutes" to die of strangulation, because "four" is a correct amount of time. Allen has not shown that there is a reasonable probability that, but for hearing the misstated amount of time,

- 15 -

the jurors would not have found Allen guilty. Therefore, no prejudice occurred. *See Carratelli*, 961 So. 2d at 324. Our confidence in the outcome is not undermined. Because Allen has not demonstrated prejudice, we need not address the deficient performance prong. *See Strickland*, 466 U.S. at 697. Therefore, we conclude that the circuit court properly denied relief on this claim.

Subclaim 5

Allen argues that trial counsel should have objected and requested a curative instruction when the prosecutor misstated that Wright's neck injuries were internal instead of external. Allen argues that this prejudiced her jury because the misstatement regarding internal injuries would have convinced them that Wright was violently strangled, a conclusion they might not have reached had they heard the truth that her neck injuries were merely external.

The record shows that the prosecutor stated during direct examination of Dr. Qaiser that the autopsy report "refers to *external* evidence of injury." In the guilt phase closing argument, the prosecutor read aloud from Dr. Whitmore's autopsy report, stating, "Then on top of that Dr. Whitmore said—it's sort of vague what he said—atraumatic neck, but then he says, 'see evidence of *internal* injuries,' and then we read that in which he says there is contusions on both sides of the neck."

Counsel's failure to object to this minor misstatement was not prejudicial to Allen. Based on the totality of the record, which shows that Allen bound, tortured,

beat, and strangled Wright, confidence in the outcome is not undermined so as to establish prejudice. *See Carratelli*, 961 So. 2d at 324. Had the jury not heard the prosecutor say that Wright's neck injuries were "internal," there is no reasonable probability that the outcome would have been different. We need not address the deficient performance prong. *See Strickland*, 466 U.S. at 697. Accordingly, we conclude that the circuit court properly denied relief on this claim.

Subclaim 6

Allen argues that the cumulative impact of the alleged errors deprived her of her right to a fair trial. However, Allen has failed to establish error as to the denial of any claim raised. Because each individual subclaim is either without merit or procedurally barred, the claim of cumulative error fails. *See Anderson v. State,* 18 So. 3d 501, 520 (Fla. 2009) (rejecting a cumulative error claim when the individual claims did not establish ineffective assistance of counsel); *Israel v. State*, 985 So. 2d 510, 520 (Fla. 2008) (holding that where individual alleged claims of error are "procedurally barred or without merit, the claim of cumulative error also necessarily fails") (quoting *Parker v. State*, 904 So. 3d 370, 380 (Fla. 2008)). Accordingly, we affirm the circuit court's finding that Allen is not entitled to relief on this claim.

**2. Failure to properly investigate and present additional mitigation evidence**

Allen argues that trial counsel was ineffective for failing to investigate and present certain mitigating evidence about Allen's traumatic background and mental health during the penalty phase. Specifically, she claims that additional mitigation evidence should have been uncovered and presented, including the existence of post-traumatic stress disorder (PTSD) and extensive sexual and physical abuse. We conclude that the absence of this mitigating evidence does not satisfy *Strickland*'s requirement of prejudice.

At the evidentiary hearing, Allen presented the testimony of Allen's former boyfriend, who testified that he sold drugs with Allen and frequently physically abused her throughout the duration of their relationship. He recounted instances of extremely violent episodes, described Allen having frequent anxiety attacks, and stated that he could not say whether he would have testified at trial had he been asked. He testified that at the time of Allen's trial in 2010, he was living in a federal halfway house after serving ten years in prison. In addition, another of Allen's aunts gave extensive and detailed testimony that Allen suffered physical and sexual abuse as a child at the hands of her mother, grandfather, and brother and that she experienced severe domestic violence as an adult. She stated that Allen suffered from intense anxiety and that she would have testified at trial had she been asked. Allen's daughter also stated that she would have testified at trial if she had been asked. She testified to seeing her mother being beaten up by multiple

boyfriends and admitted that she had not been forthcoming in her deposition immediately after the murder. Allen's son testified that he would have been available to testify at Allen's trial, if asked, and that he witnessed Allen's physical abuse and frequent mood swings when he was a child.

Dr. Russell testified at the evidentiary hearing for Allen. In preparation for his testimony, he met with Allen and several family members to discuss her childhood and behavioral problems. He testified of his theory that Allen's childhood traumas caused her to suffer from PTSD, which he said she experienced at the time of Wright's murder. He then testified that in light of Allen's history, records, discussions with her family, and observable emotional dysregulation, she could have been in a state of extreme emotional disturbance at the time of the homicide. He stated that persons who are unable to control their emotions would eventually lose their ability to think rationally if faced with the situation that Allen faced the day of the homicide. He testified that had he only reviewed the limited information given to Dr. Gebel at trial, he would not have been able to come to the PTSD diagnosis. He admitted on cross-examination that Allen did not tell him what she was thinking or feeling at the time of the homicide, and that Allen denied murdering Wright.

Dr. Gamache, the State's expert at the evidentiary hearing, testified that after reviewing numerous records, including the discovery related to the case and

investigation and Allen's medical and psychological records, he did not believe that any significant mitigation evidence was left out of Allen's penalty phase. He testified that the jury was informed by Dr. Gebel and Dr. Wu in sufficient detail of Allen's childhood trauma, past sexual and physical abuse, and domestic violence. He also explained that Allen currently exhibited no PTSD symptoms and had never been diagnosed with the disorder, other than by Dr. Russell. He also stated that there was no evidence that Allen displayed PTSD symptoms at the time of the homicide.

Allen's trial counsel testified at the evidentiary hearing that he made several attempts to talk to Allen's family members and asked Allen's aunt, Myrtle Hudson, several times when he could speak with them. He testified that Allen did not want to discuss the case when he met with her and that she did not want her daughter involved in the case. He stated that he made no attempts to talk with Allen's daughter because he was told that she would be uncooperative and did not want anything to do with Allen. He testified that he was hesitant to put her on the stand because she could be impeached. He further testified that he did not feel that there was a need to talk to Allen's son in light of the information he already had obtained from other family members. He testified that he called Allen's former boyfriend twice but he got no answer.

Trial counsel also testified that he believed that psychologist Dr. Gebel and neuropsychiatrist Dr. Wu were sufficient to testify to Allen's mental health issues at the penalty phase. Dr. Gebel reviewed Allen's history and interviewed Allen once, telling the jury about the significant intracranial injuries she suffered, as well as her frontal lobe disorder, decreased cognitive ability, and impulse control issues that would prevent Allen from behaving normally and from understanding the consequences of her behavior. Dr. Wu explained to the jury that certain areas of Allen's brain did not function normally and that she suffered from lack of impulse control.

At trial, counsel presented the testimony of Dr. Wu, Dr. Gebel, and Allen's aunt Myrtle Hudson that outlined Allen's mental health issues and the physical and sexual abuse she suffered while growing up and as an adult. The jury heard of her issues with impulse control, her intracranial brain injuries, and the traumatic childhood and violent relationships she endured.

Upon review of the trial court's order and record, we conclude that defense counsel's mitigation investigation did not prejudice Allen. Had the additional mitigation evidence been introduced as Allen claims, there is no reasonable probability that the outcome would have been different. First, Allen overemphasizes the value of evidentiary hearing testimony presented by Allen's family members and Dr. Russell. The testimony presented regarding Allen's

background was cumulative to the mitigation already presented at trial. This Court has "repeatedly held that counsel is not ineffective for failing to present cumulative evidence." *Jones v. State*, 998 So. 2d 573, 586 (Fla. 2008); *see also Rhodes v. State*, 986 So. 2d 501, 512-13 (Fla. 2008) ("Even if we were to find counsel's conduct deficient, [the defendant] cannot demonstrate prejudice. Any testimony the additional witnesses would have provided would have been cumulative to that provided by the witnesses at resentencing. . . . The additional testimony would only have added to the mitigation already found. Even if given more weight, the mitigation would not outweigh the . . . strong aggravators . . . ."). The absence of the more specific evidence regarding Allen's traumatic upbringing therefore does not render the penalty phase unreliable. Further, the jury's recommendation of death was unanimous, and the trial court found that the State established two significant aggravators: (1) committed while Allen was engaged in the commission of kidnapping; (2) especially heinous, atrocious, or cruel. *See Allen*, 137 So. 3d at 953-54. In light of this aggravation, Allen has not established how the additional mitigation presented at the evidentiary hearing would impact the balancing of aggravating and mitigating factors by the jury. *See England v. State*, 151 So. 3d 1132, 1138 (Fla. 2014) ("For a defendant to establish that he was prejudiced by trial counsel's failure to investigate and present mitigation, the defendant 'must show that but for his counsel's deficiency, there is a reasonable probability he

would have received a different sentence. To assess that probability, we consider the "totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the [postconviction] proceeding"—and "reweig[h] it against the evidence in aggravation." ' ") (quoting *Dennis v. State*, 109 So. 3d 680, 695 (Fla. 2012))).

Moreover, defense counsel's failure to present more evidence of Allen's mental health did not prejudice Allen. Dr. Russell testified that Allen was likely under the influence of an extreme emotional disturbance at the time of the crime, but admitted on cross-examination that Allen never told him what was going through her mind at the time of the capital felony. He also conceded that she denied killing Wright. The value of his opinion that she suffered from an extreme mental or emotional disturbance at the time of the homicide is therefore weakened. Further, the State's rebuttal expert, Dr. Gamache, rebutted Dr. Russell's findings, testifying that there was insufficient evidence from which to conclude that Allen suffered from PTSD throughout her life and at the time of the homicide. The additional mitigation presented would not have outweighed the established aggravating factors to undermine the confidence in the outcome such that Allen would have received a life sentence. *See Jones*, 998 So. 2d at 585 (determining that there was no reasonable probability that evidence of the defendant's mental health history would have led to a different outcome where the State had

established three aggravating factors, including the HAC aggravator); *Breedlove v. State*, 692 So. 2d 874, 878 (Fla. 1997) (holding that aggravating factors of HAC, prior violent felony, and murder committed during the course of a burglary overwhelmed mitigation testimony presented regarding childhood abuse and alcohol abuse).

Further, based on trial testimony, the trial court found, as nonstatutory mitigating factors, that Allen was a victim of physical abuse, possible sexual abuse, and that she has brain damage. The additional mitigation testimony would have, at most, only added weight to these mitigating circumstances. Allen has failed to establish that her sentence would have been different had the court given more weight to these nonstatutory mitigators. *See Jones*, 998 So. 2d at 587. Our confidence in the outcome is not undermined.

For these reasons, we affirm the postconviction court's denial of this claim.

**3. Improper eliciting of testimony that Allen poured chemicals on the victim**

Allen claims that trial counsel was ineffective during his recross of Quintin because counsel's questioning elicited testimony that Allen argues was harmful to the defense.

The record reflects that in Quintin's deposition he stated that Allen poured caustic substances "on" Wright's face. In his police statement, Quintin stated that he could not remember which specific substances were poured onto Wright, but

that it was "a whole bunch of stuff." During direct examination, when asked if he knew the types of liquids that were poured onto Wright's face, he answered, "It was the bleach, the green rubbing alcohol, the spritz for hair, fingernail polish remover." On cross-examination, trial counsel asked if each of the chemicals was poured separately into Wright's eyes and mouth, and Quintin answered, "Yes, sir." On redirect examination, Quintin testified that he was not sure what liquids were poured onto Wright other than rubbing alcohol. Then, on recross-examination, when trial counsel asked several times which specific substances were poured onto Wright, Quintin testified that "bleach, nail polish remover, and ammonia" were poured "in" Wright's face and eyes and down her mouth. The record also shows that Dr. Qaiser testified that the autopsy report did not indicate that any bleach or caustic substances were ever poured down Wright's throat.

Allen asserts that Quintin's testimony on recross-examination that Allen poured bleach, nail polish remover, and ammonia in Wright's face, mouth, and eyes was more specific and damaging to her case than his previous, more generic, testimony. Allen argues that the elicitation of this testimony was deficient representation because it harmed the defense's case by painting for the jury a more painful picture of the specific harmful ways that Wright was tortured. The postconviction court found that trial counsel's tactics were not unreasonable, and we agree. The record demonstrates that counsel was not deficient in eliciting

- 25 -

Quintin's testimony on recross-examination that bleach, ammonia, and nail polish remover were poured into Wright's eyes, mouth, and face. Quintin's testimony on direct examination specifically mentioned bleach and nail polish remover, but was inconsistent with his other testimony. In his police statement, Quintin said that he could not remember which substances were used, and he also stated on cross- and redirect examination that he could not specifically identify the types of substances poured onto Wright. Counsel's questions regarding which substances were poured, and the elicitation of Quintin's answer regarding nail polish, ammonia, and bleach, were appropriate because counsel was impeaching Quintin by attempting to show the inconsistencies in his testimony. Counsel's elicitation of this testimony on recross-examination was a reasonable tactical decision that resulted in the impeachment of Quintin. Additionally, his testimony about the bleach was further impeached by the forensic evidence and Dr. Qaiser's testimony that no evidence of bleach was found on Wright. Trial counsel was therefore not deficient for the strategic decision to impeach Quintin in that manner.

Moreover, even if counsel was deficient, Allen has not suffered prejudice. The trial court's HAC aggravator determination was based on a multitude of evidence that was unrelated to the types of chemicals poured onto Wright. The record shows that Allen tied and bound, beat, tortured, and strangled Wright. There is not a reasonable probability that the outcome would have been different

- 26 -

had the jury not heard the specific testimony regarding which chemicals were poured onto Wright and where they were poured. *Brant v. State*, 197 So. 3d 1051, 107 (Fla. 2016) (finding no prejudice in light of the evidence for the HAC aggravator). Our confidence in the outcome is not undermined. Therefore, we affirm the denial of relief.

**4. Failure to object to Dr. Qaiser's testimony that unconscious people feel pain**

Allen argues her trial counsel was ineffective for failing to object to Dr. Qaiser's testimony in the penalty phase that unconscious people have the ability to feel pain.

The record reflects that Dr. Qaiser testified for the State that,

[W]hether people who are unconscious, either they are minimally unconscious, mildly, moderately, or severely or profoundly unconscious, do they perceive pain or not. There is [very] little known about that. But the studies have been done, especially in Belgium, in Europe, and here also in the United States and all the other parts of North America . . . . So the conclusion was . . . that they register the pain, but it is not necessarily that they will outwardly manifest it.

The prosecutor then asked, "And [the victim] also could have been experiencing pain even if she is unconscious?" Dr. Qaiser answered, "That's true." On cross-examination, Dr. Qaiser also testified, "[It] is not necessary that the outward manifestation of pain will be there. But as far as the perception of pain by the subject, you cannot rule that out. And studies have shown that this has taken

- 27 -

place." Dr. Qaiser then admitted that he definitely could not testify within a reasonable degree of medical probability that "there was a sensation of pain in the present case" while Wright was unconscious.

At the evidentiary hearing, trial counsel testified that he planned to refute Dr. Qaiser's testimony that unconscious people feel pain by cross-examining him. Trial counsel also testified that Dr. Qaiser admitted on cross-examination that in this case specifically he "couldn't say one way or the other" whether Wright experienced pain.

Allen claims that trial counsel should have objected to Dr. Qaiser's testimony because the testimony was speculative and inflammatory hearsay. However, the record establishes that counsel made a strategic decision not to object and rather to cross-examine Dr. Qaiser because he chose as a matter of strategy to attempt to refute the testimony. He ultimately succeeded in getting Dr. Qaiser to acknowledge on cross-examination that he could not definitively say that Wright felt pain within a reasonable degree of medical probability. This discredited his earlier testimony. Accordingly, the record establishes that counsel's decision was a reasonable one under the norms of professional conduct and, therefore, not deficient. Given that finding, we conclude that counsel was not deficient for failing to object to the testimony.

Allen has also not demonstrated prejudice. Here, there was a large amount of evidence supporting the HAC aggravator finding that was unrelated to Dr. Qaiser's testimony regarding unconscious people feeling pain. Quintin testified that Allen kidnapped, bound, beat, and strangled Wright, and Dr. Qaiser testified regarding Wright's contusions and ligature marks. *Allen*, 137 So. 3d at 953. This evidence was completely separate from the question of whether Wright felt pain after she was rendered unconscious. Given Quintin's testimony that Allen strangled Wright even while Wright pleaded to be released and screamed that she would wet her pants, as well as the forensic evidence of contusions on Wright's torso, there is no reasonable probability that an objection to the admissibility of Dr. Qaiser's testimony regarding pain would have affected the outcome of Allen's trial. Our confidence in the outcome is not undermined. Therefore, we affirm the postconviction court's denial of relief on this claim.

## 5. Failure to object to several instances of prosecutorial misconduct or move for a mistrial during the penalty phase

Allen argues her trial counsel was ineffective for failing to object to multiple instances of prosecutorial misconduct during the penalty phase.

Subclaim 1

Allen claims that trial counsel should have objected, requested a curative instruction, and moved for a mistrial when the prosecutor stated during cross-examination of Dr. Gebel that Allen was involved in drugs and had previously

served time in prison, and misstated during cross-examination of Myrtle Hudson that Allen was convicted several times for selling drugs. She argues that counsel's deficiencies prejudiced her penalty phase by making the jury believe she was a career criminal unworthy of mercy.

The record shows that Dr. Gebel testified for the defense at trial that Allen suffered traumatic brain injuries. On cross-examination, the prosecutor asked Dr. Gebel if he had reviewed Allen's prison records, and Dr. Gebel answered that according to his notes, he did not know what type of records they were. The prosecutor responded, "So, you don't know if those were county jail records or prison records where she had been in prison before?" The prosecutor also asked if Dr. Gebel was aware that Allen had been "involved in drugs for a number of years." Myrtle Hudson also testified for the defense at trial, and the prosecutor asked her if she was "aware that [Allen] was convicted several times for selling drugs, right?"

However, nothing in the record undermines confidence in the outcome of the penalty phase, but rather supports the postconviction court's finding that there is no prejudice. *See Sochor v. State*, 883 So. 2d 766, 771-72 (Fla. 2004) (citing *Strickland*, 466 U.S. at 694). The prosecutor's comments about Allen's time in prison and her convictions for drug sales were isolated, and did not approach the same level of impropriety as comments in other cases where this Court has granted

- 30 -

relief.  *See Brooks v. State*, 762 So. 2d 879, 905 (Fla. 2000) (remanding for new penalty phase in light of the "cumulative effect of the numerous, overlapping improprieties in the prosecutor's penalty phase closing argument").  Further, the testimony that Allen was involved in a lifestyle of drugs led the trial court to find that such involvement was a nonstatutory mitigator.  In light of the penalty phase evidence and the aggravating circumstance of HAC, which is among the weightiest in Florida's death penalty scheme, *see Martin v. State*, 151 So. 3d 1184, 1198 (Fla. 2014), it is clear that counsel's deficiencies did not prejudice Allen.  Our confidence in the outcome is not undermined.  Because Allen has not demonstrated prejudice, we need not address the deficient performance prong.  *See Strickland*, 466 U.S. at 697.  Therefore, we conclude that the circuit court properly denied relief on this claim.

Subclaim 2

Allen claims that trial counsel should have objected and moved for a mistrial when the prosecutor improperly asked Dr. Wu two questions regarding Allen's future dangerousness in prison.  Allen argues that counsel's deficiencies prejudiced her in the penalty phase by leading the jury to believe that she was a danger to society.

Prior to trial, the trial court entered an order granting Allen's motion to preclude improper argument.  The record shows that the State violated the court's

order not to make arguments about Allen's future dangerousness by asking two questions about Allen's future threat to prison guards. During cross-examination of Dr. Wu, the prosecutor asked, "So, [an episode of a violent act from Allen] could happen, say, in the future to a prison guard, correct?" The prosecutor then asked, "So, you are saying to a reasonable degree of medical probability she is a risk to any prison guard who is watching her in the future?"

Allen previously raised this issue on direct appeal, and we found that the questions did not amount to fundamental error. *Allen*, 137 So. 3d at 962. Allen therefore cannot demonstrate that the questions were prejudicial under *Strickland*. *See Serrano v. State*, 225 So. 3d 737, 751 (Fla. 2017) (holding that the defendant could not establish prejudice under *Strickland* because he failed to show the comments were fundamental error on direct appeal). Our confidence in the outcome is not undermined. Because Allen has not demonstrated prejudice, we need not address the deficient performance prong. *See Strickland*, 466 U.S. at 697. Therefore, we conclude that the circuit court properly denied relief on this claim.

Subclaim 3

Allen claims that trial counsel should have objected when the prosecutor asked Dr. Wu if he saw Allen display signs of remorse following the murder. She argues that counsel's deficiency prejudiced her in the penalty phase by putting a nonstatutory aggravating circumstance before the jury.

- 32 -

The record shows that Dr. Wu testified for the defense that people suffering from lack of impulse control often feel remorseful after a violent outburst. On cross-examination, the prosecutor asked Dr. Wu, "Did you see and study anything about Margaret Allen that she had any level of remorse after this murder occurred?"

Allen has failed to demonstrate prejudice. Even if this question were not proper cross-examination in light of Dr. Wu's testimony on direct, given the overwhelming evidence of guilt presented, as well as the aggravating circumstances found by the court, there is not a reasonable probability that the jurors would have changed their minds regarding the balancing of the aggravating and mitigating circumstances solely due to hearing this question about Allen's lack of remorse. *See Sochor*, 883 So. 2d at 771 (citing *Strickland*, 466 U.S. at 694). Our confidence in the outcome is not undermined. Because Allen has not demonstrated prejudice, we need not address the deficient performance prong. *See Strickland*, 466 U.S. at 697. Therefore, we conclude that the circuit court properly denied relief on this claim.

Subclaim 4

Allen also argues that the prosecutor made an improper Golden Rule argument during closing argument. "A 'golden rule' argument asks the jurors to place themselves in the victim's position, [and] asks the jurors to imagine the

victim's pain and terror or imagine how they would feel if the victim were a relative." *Hutchinson v. State*, 882 So. 2d 943, 954 (Fla. 2004). In this case, the prosecutor stated:

> A sense of this pain above and below the ligature mark. The desire to survive. That basic human instinct. You know, I want to live. I don't want to die. I want to see my children again. I want to see my companion again. And finally the jerky movements Dr. Qaiser told us about. The movement of the head and the neck. . . . Those are the last few moments of Wenda Wright's life.

Allen claims that the prosecutor's argument improperly described the crime scene with an imaginary script and invited the jurors to place themselves in the position of the victim. Allen argues that counsel's deficiency in failing to object prejudiced her in the penalty phase by unduly inflaming the sympathy and passions of the jury against her. However, Allen has failed to demonstrate prejudice. Hearing these comments during closing argument would not have caused the jurors to weigh the aggravation or mitigation differently. The significant amount of evidence supporting the HAC aggravator in this case, such as Quintin's testimony that Allen kidnapped and tortured Wright and the medical forensic evidence of contusions and ligatures on Wright's body, shows that there is no reasonable probability that hearing the comments in question affected the jury's sentencing recommendation. *See Sochor*, 883 So. 2d at 771 (citing *Strickland*, 466 U.S. at 694). Failing to object to the prosecutor's argument did not affect the fairness and reliability of the proceeding such that confidence in the outcome is undermined.

- 34 -

Because Allen has not demonstrated prejudice, we need not address the deficient performance prong. *See Strickland*, 466 U.S. at 697. Therefore, we conclude that the circuit court properly denied relief on this claim.

Subclaim 5

Allen claims that trial counsel should have objected when the prosecutor stated that "in certain cases" "the law calls for" a death penalty recommendation, because it improperly gained sympathy for the prosecutor and misstated the law. She argues that counsel's deficiency prejudiced her because the comment told the jurors that they were required to recommend death.

During penalty phase closing arguments, the prosecutor stated:

[T]here are cases where the recommendation for the death penalty is warranted. This is that case . . . . It is not going to be an easy decision. It's not easy to stand up here and ask a jury to recommend a death penalty. But in certain cases it is what the law calls for. It's what justice calls for.

Allen cannot show the prosecutor's comments prejudiced her. The jury instructions correctly informed Allen's jury of the law relating to the weighing of aggravators and mitigators. *Cf. Anderson*, 18 So. 3d at 517 (finding no prejudice and citing previous cases where this Court "determined that the defendants were not prejudiced by the improper statements of the prosecutors because the juries were given the proper instructions for analyzing aggravating and mitigating circumstances"). Our confidence in the outcome is therefore not undermined.

Because Allen has not demonstrated prejudice, we need not address the deficient performance prong. *See Strickland*, 466 U.S. at 697. Therefore, we conclude that the circuit court properly denied postconviction relief on this claim.

Subclaim 6

Allen claims that trial counsel should have objected when the prosecutor stated during closing arguments that, because Dr. Gebel was paid for his testimony, he refused to change his opinion even when faced with new facts of the case. She argues that this misrepresentation of Dr. Gebel's testimony prejudiced her by denigrating him as an expert witness, undermining her mitigation.

The record shows that during cross-examination, the prosecutor asked Dr. Gebel if his diagnosis of Allen's poor executive functioning would change a bit now that he knew more facts of the case, and Dr. Gebel replied, "It might change the degree with which she's injured, but it wouldn't change the fact that she has been injured throughout the years." Dr. Gebel then answered in the affirmative when asked if his new knowledge of the facts "might change the severity or the degree of that injury." The prosecutor also stated during closing arguments:

> And then I said, well, Doctor, what if you knew those were the facts in this case because that is exactly what she did? Wouldn't that change your opinion? Well, blah, blah, blah, no, that really wouldn't change my opinion. And you know why? Because he was paid $3,000 to come in here and say that she had cognitive disorders.

Allen did not suffer prejudice. Allen has failed to demonstrate a reasonable probability that, but for counsel's failure to object to the State's characterization of Dr. Gebel's testimony, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 694. Given the overwhelming evidence of guilt presented, there is no reasonable probability that the jurors would have changed their minds regarding the balancing of aggravating and mitigating circumstances solely due to hearing that the expert witness was paid to testify and would not change his opinion. *See Sochor*, 883 So. 2d at 771 (citing *Strickland*, 466 U.S. at 694). Our confidence in the outcome is not undermined. Because Allen has not demonstrated prejudice, we need not address the deficient performance prong. *See Strickland*, 466 U.S. at 697. Therefore, we conclude that the circuit court properly denied relief on this claim.

Subclaim 7

Allen claims that trial counsel should have objected when the prosecutor during closing arguments characterized Allen's pouring of liquids or water on Wright's face as waterboarding torture, because the comment was inflammatory and the record contained no evidence that Allen waterboarded Wright.

During closing argument, the prosecutor stated:

We have heard a lot of things on the news in the last couple of years about torture, systematic torture. Water boarding, pouring water on someone's face making them think that they are drowning. That is torture. That is an attempt to get somebody to fess up to something.

- 37 -

That didn't work. And all the while, all the while, you know, think of what is going through Wenda Wright's mind. So, the liquids doesn't [sic] work.

Allen has failed to demonstrate that the prosecutor's description of Wright's suffering as waterboarding prejudiced her penalty phase. In light of Quintin's testimony that liquids were poured on Wright's face and that she was tortured, as well as the HAC aggravating factor found by the trial court, there is no reasonable probability that the jurors would have changed their minds regarding the balancing of aggravating and mitigating circumstances solely due to hearing the prosecutor describe Allen's actions as waterboarding. *See Sochor*, 883 So. 2d at 771 (citing *Strickland*, 466 U.S. at 694). Our confidence in the outcome is not undermined. Because Allen has not demonstrated prejudice, we need not address the deficient performance prong. *See Strickland*, 466 U.S. at 697. Therefore, we conclude that the circuit court properly denied relief on this claim.

Subclaim 8

Allen claims that trial counsel should have objected and requested curative instructions during closing arguments because the prosecutor misstated the evidence. She claims the prosecutor wrongly stated that Dr. Wu testified that a PET scan is not a standalone test and that he relies on MRIs and CAT scans in diagnosing brain trauma.

The record shows that during cross-examination, Dr. Wu stated that an MRI is not always done in conjunction with a PET scan, and although it would be "preferable" to have an MRI in conjunction with a PET scan, it "is not essential" and he would not lack any necessary information without it. During closing arguments, the prosecutor stated:

> Dr. Wu admitted in his own slide—did you see it in his own slide that the PET scan is not a standalone test. Remember? He said, I don't use this as standalone. We rely on MRIs, CAT scans, and the neuropsych' testing. Well, there is no MRI. There is no CAT scan.

Allen has not suffered prejudice. The amount of evidence supporting the two aggravating circumstances in this case shows that there is no reasonable probability that, but for hearing the comments in question, the jury's recommended sentence would have been different. *See Sochor*, 883 So. 2d at 771 (citing *Strickland*, 466 U.S. at 694). Our confidence in the outcome is not undermined. Because Allen has not demonstrated prejudice, we need not address the deficient performance prong. *See Strickland*, 466 U.S. at 697. Therefore, we conclude that the circuit court properly denied relief on this claim.

Subclaim 9

Allen claims that trial counsel should have objected and moved for a mistrial during closing arguments because the prosecutor introduced evidence of Allen's bad character—that she was a bad mother because her children were in prison—without her counsel's previously opening the door by presenting evidence of good

character. Allen argues that this prejudiced her because the comments portrayed her as unsympathetic and inflamed the jurors' passions.

The record shows that Myrtle Hudson testified that two of Allen's children are in prison and one of them stays with her grandmother. The prosecutor stated during closing arguments:

> You heard about the Defendant's time in prison for previous drug sale convictions. You heard about her children, her son in prison for 11 years and one of her daughters is in prison for five years. And her other daughter is with her grandmother. And we can only hope that there may be some hope for that daughter.

Allen did not suffer prejudice because there is no reasonable probability that hearing about Allen's poor mothering influenced the jurors' weighing of the aggravating and mitigating circumstances. Our confidence in the outcome is not undermined. *See Sochor*, 883 So. 2d at 771 (citing *Strickland*, 466 U.S. at 694). Because Allen has not demonstrated prejudice, we need not address the deficient performance prong. *See Strickland*, 466 U.S. at 697. Therefore, we conclude that the circuit court properly denied postconviction relief on this claim.

Subclaim 10

Allen claims that trial counsel should have objected and moved for a mistrial during closing arguments because the prosecutor added to the authority of his office by saying that he wrote down Dr. Gebel's testimony. She also claims that the prosecutor misstated the doctor's testimony by claiming that the doctor said

- 40 -

that Allen had no major brain issues or brain injury. Allen argues that this prejudiced her because the comments devalued her mental health mitigation.

The record shows that on direct examination, Dr. Gebel stated that Allen suffered "intracranial injuries" and reasoned that "[w]ithin a reasonable degree of medical probability she does fit a patient who has brain damage." Dr. Gebel also testified that he was unsure if Allen had any structural brain damage, and that she did not have "any brain injury in terms of weakness in an arm or leg." In closing, the prosecutor stated, "First of all, what I wrote down was [Dr. Gebel] said, no major brain issue with the Defendant. No major brain issues with the Defendant. Okay?" The prosecutor also stated, "And, again, the first doctor says no major brain injury."

Allen has failed to establish prejudice under *Strickland*. Allen has not demonstrated a reasonable probability that the outcome of the proceeding would have been different but for the prosecutor's summarizing Dr. Gebel's testimony as opining that Allen did not have a major brain injury—as Dr. Gebel equivocated regarding possible structural brain damage, which is consistent with having no major brain damage. Our confidence in the outcome is therefore not undermined. *See Sochor*, 883 So. 2d at 771 (citing *Strickland*, 466 U.S. at 694). Therefore, we conclude that the circuit court properly denied relief on this claim.

Subclaim 11

Allen argues that the alleged errors by counsel cumulatively deprived her of a fair trial. However, because each subclaim, addressed individually, is without merit, the claim of cumulative error also necessarily fails. *See Israel*, 985 So. 2d at 520 (denying a claim of cumulative error when the individual claims did not establish ineffective assistance of counsel); *Bell v. State*, 965 So. 2d 48, 75 (Fla. 2007) ("[B]ecause we conclude that none of the [individual ineffective assistance of counsel] claims has merit, we affirm the circuit court's determination that there is no cumulative error."). Therefore, we conclude that the circuit court properly denied postconviction relief on this claim.

**6. Asking if Allen became part of the culture of "drugs, thugs, and violence"**

Allen argues that trial counsel was ineffective for asking if Allen became a part of the culture of "drugs, thugs, and violence."

The record shows that in the penalty phase of Allen's trial, trial counsel questioned Allen's aunt, Myrtle Hudson, about Allen's neighborhood:

Q: Describe the area of town that she lived in, if you would for the jury?

A: We stayed in a drug neighborhood. She stayed in a drug neighborhood.

Q: And so, she grew up around drugs?

A: Drugs and thugs.

- 42 -

Q: And violence?

A: Yes, sir. Drugs, thugs, and violence. Yes, sir.

At the evidentiary hearing, trial counsel testified that he asked Hudson about Allen's neighborhood, which elicited from her the phrase, "drugs, thugs, and violence." He testified that he did this in order to show "the atmosphere in which [Allen] lived, and that it had an effect on her." He also testified that the general theme of his mitigation was to show the negative atmosphere of Allen's cultural upbringing to the jury and its impact on her. He testified that the phrase at issue was specifically brought up by Hudson, not by him.

Allen's claim is refuted by the record. The record reflects that trial counsel's questioning regarding Allen's upbringing was strategic and purposeful—he aimed to show the jury the challenging culture in which Allen lived. When asked to describe the area of town in which Allen grew up, Hudson described the neighborhood using the phrase "drugs, thugs, and violence." This evidence supported the trial court's finding of the nonstatutory mitigator that Allen grew up in a violent and drug-infested neighborhood. The testimony elicited by trial counsel thereby amounts to the same information established by counsel and found by the trial court. Counsel was not deficient in bringing up that line of questioning, despite the phrase that was elicited during it.

- 43 -

Moreover, Allen has failed to show prejudice. There is no reasonable probability that the jury hearing that Allen grew up surrounded by "drugs, thugs, and violence" impacted their balancing of the aggravating and mitigating circumstances in light of the evidence of torture and the victim's desperate pleas to go home prior to her death. *See Sochor*, 883 So. 2d at 771 (citing *Strickland*, 466 U.S. at 694); *Brant*, 197 So. 3d at 1070 (finding no prejudice in light of the evidence for the HAC aggravator). Our confidence in the outcome is not undermined. We therefore conclude that the circuit court properly denied relief on this claim.

### 7. Failure to call a forensic expert

Allen argues the postconviction court erred in denying the claim that trial counsel was ineffective during both the guilt and penalty phases of her trial for failing to call his own forensic expert.

We have held that trial counsel's decision not to call certain witnesses to testify is often reasonable trial strategy, and mere disagreement with that reasoning is not enough to show deficient performance. *See Johnston v. State*, 63 So. 3d 730, 741 (Fla. 2011) (holding that counsel's failure to call defendant's friend to offer mitigation testimony was reasonable trial strategy). Cross-examination is often sufficient to reveal deficiencies in an expert's presentation, especially when re-

presenting the same evidence through other witnesses would not alter the outcome.

*See Anderson v. State*, 220 So. 3d 1133, 1146 (Fla. 2017).

A number of factors must be considered when determining whether trial counsel's decision not to call an expert to rebut the State's expert constitutes deficient performance:

> First among these are the attorney's reasons for performing in an allegedly deficient manner, including consideration of the attorney's tactical decisions. *See State v. Bolender*, 503 So. 2d 1247, 1250 (Fla. 1987); *Lightbourne v. State*, 471 So. 2d 27, 28 (Fla. 1985). A second factor is whether cross-examination of the State's expert brings out the expert's weaknesses and whether those weaknesses are argued to the jury. *Card v. Dugger*, 911 F.2d 1494 (11th Cir. 1990). *See Rose v. State*, 617 So. 2d 291, 297 (Fla. 1993)[.] The final factor is whether a defendant can show that an expert was available at the time of trial to rebut the State's expert. *See Elledge v. Dugger*, 823 F.2d 1439, 1446 (11th Cir. 1987).

*State v. Riechmann*, 777 So. 2d 342, 354 (Fla. 2000).

The postconviction court's order states:

> Attorney Bankowitz . . . cross-examined Dr. Qaiser extensively with Dr. Whitmore's report and felt that he did not need any other expert to come in and say the same thing Dr. Whitmore said . . . . Dr. Qaiser admitted that Dr. Whitmore performed the actual autopsy, and he was only able to view photographs. Dr. Qaiser testified that he found ligature marks on the neck, that she suffered a ligature strangulation. He agreed that Dr. Whitmore's report found contusions on the neck, and made no mention of ligature marks. Dr. Qaiser disagreed that cocaine intoxication was a contributory factor, although he admitted that was in Dr. Whitmore's report. Dr. Qaiser testified that there was no evidence of bleach or a caustic substance on Ms. Wright. Dr. Qaiser testified that he could not state within a reasonable degree of medical probability that the victim felt pain while unconscious.

Everything Dr. Spitz testified to was brought out on cross-examination of Dr. Qaiser. While Dr. Spitz disagreed with Dr. Qaiser's findings, Dr. Spitz did not completely discredit those findings as scientific impossibilities, but instead agreed they were possibilities. The Court finds that counsel's strategic decision not to hire a forensic expert, but instead to challenge Dr. Qaiser's findings through crossexamination, [sic] was not unreasonable under prevailing professional norms.

The record supports the postconviction court's findings. The record reflects that Dr. Qaiser testified that Dr. Whitmore, not Dr. Qaiser, performed the autopsy; that the autopsy report did not mention ligature marks and did mention cocaine being a contributing factor in Wright's death; that no evidence of a caustic substance on Wright existed; and that he could not state within reason that Wright experienced pain while unconscious. Further, these admissions and weaknesses elicited from Dr. Qaiser on cross-examination were the same admissions and weaknesses that Dr. Spitz testified to at the evidentiary hearing. Therefore, the jury was informed as to the conclusions Dr. Spitz would have made if he had testified. The record also reflects that trial counsel understood the science of the case and decided that he did not need an expert to say the same thing that he elicited out of Dr. Qaiser on cross-examination with Dr. Whitmore's autopsy report. There is no deficiency when counsel had a tactical reason for not calling his own expert and his cross-examination elicited the same weaknesses that the expert would have. *Rigterink v. State*, 193 So. 3d 846, 867 (Fla. 2016).

Accordingly, counsel's decision not to call the forensic expert was a strategic one and he was not deficient.

Moreover, Allen cannot show prejudice. The evidence at trial included Quintin's testimony that Wright was kidnapped, bound, beaten, and unable to leave, even as she begged to be released before and while being strangled. Dr. Spitz agreed that the death was a homicide and that ligature strangulation was possible and that he could not rule it out. He even agreed that the bruising on Wright's body could have occurred by restraint. Everything testified to by Dr. Spitz was brought out on Dr. Qaiser's cross-examination. This testimony shows that even if counsel had presented the testimony of Dr. Spitz, it would not have undermined the State's case to any significant extent. *See Abdool v. State*, 220 So. 3d 1106, 1114-15 (Fla. 2017) (concluding that there was no prejudice where the expert that trial counsel "fail[ed] to consult and retain actually provided information that is consistent with the testimony presented by the State's arson expert"). Our confidence in the outcome is not undermined, and we conclude that the circuit court properly denied postconviction relief on this claim.

### 8. Failure to impeach Quintin with prior inconsistent statements

Allen argues that trial counsel was ineffective for failing to impeach Quintin with prior inconsistent statements. She contends that counsel failed to impeach Quintin with his police statement indicating that Allen did not pour bleach on

Wright, which conflicts with his trial testimony that Allen poured bleach on Wright.

The record reflects that in his police statement, Quintin stated that he could not remember all of what was poured onto Wright before the homicide. He stated that Allen procured "alcohol" and hair products to pour onto Wright, that she had boxes of bleach, and that she did not have a bleach bottle but rather used a hair products bottle. He also stated that Wright's legs were tied with a belt while the liquids were poured onto her. On direct examination, Quintin testified that he personally held Wright's arms and legs down as Allen poured bleach and other chemicals on Wright's face. On cross examination, Quintin admitted that his trial testimony conflicted with his previous testimony regarding how Wright was restrained while the substances were poured on her. He testified that the statement he gave to the police was the truth, and that he had lied on direct examination.

Quintin's police statement shows that he never actually stated that bleach was not poured onto Wright, but rather stated that although Allen had boxes of bleach, she did not have a *bottle* of bleach and that he was unsure what chemicals, other than alcohol, were used. These statements are not wholly inconsistent with his trial testimony. Moreover, as discussed in relation to claim three, counsel did cross-examine Quintin about many inconsistencies in his testimony and brought out this inconsistency on re-cross—choosing to rely on Dr. Qaiser's testimony that

no evidence of bleach was found on Wright to demonstrate that Quintin's testimony should not be believed.  This trial strategy was not unreasonable.

For similar reasons, Allen has not demonstrated prejudice.  Given that trial counsel did impeach Quintin with other inconsistent statements at trial, there is not a reasonable probability that the jury would have found Allen not guilty or that the jurors would have weighed the aggravation and mitigation differently had counsel impeached Quintin as Allen claims.  "No prejudice result[s] from counsel's failure to present cumulative evidence of inconsistent statements." *Green v. State*, 975 So. 2d 1090, 1104 (Fla. 2008) (holding that counsel was not ineffective for failing to impeach with one statement because counsel impeached witness with many other inconsistent statements).  The jury was aware that Quintin had lied on the stand and that his testimony was inconsistent in places.  Our confidence in the outcome is therefore not undermined.  We therefore conclude that the circuit court properly denied relief on this claim.

### 9. Failure to adequately challenge or strike a juror

Allen argues that counsel was ineffective for failing to challenge juror Carll for cause or to strike her peremptorily because of the juror's strong predisposition for recommending the death penalty.

A valid claim of ineffective assistance of counsel for failure to raise or preserve a for-cause challenge against the juror must establish that the juror "was

actually biased against the defendant," such that he or she had a "bias-in-fact that would prevent service as an impartial juror." *Carratelli v. State*, 961 So. 2d at 323-24. The evidence of the juror's actual bias must "be plain on the face of the record," *id.* at 324, and amount to "something more than mere doubt about that juror's impartiality," *Mosley v. State*, 209 So. 3d 1248, 1265 (Fla. 2016). We have described the standard as follows:

> Where reasonable people could disagree about a juror's fitness to serve, the showing of prejudice required for postconviction relief is lacking.

*Carratelli*, 961 So. 2d at 323-24 (quoting *Carratelli v. State*, 915 So. 2d 1256, 1261 (Fla. 4th DCA 2005)). When a juror makes statements suggesting bias but later makes clear his or her ability to be impartial, actual bias will not be found. *See id.* at 327. The analysis of this issue begins with the *Strickland* prejudice prong, "as it is necessary to establish that the juror was actually biased before proving that counsel performed deficiently by failing to challenge that juror due to bias." *Patrick v. State*, 246 So. 3d 253, 263 (Fla. 2018).

Allen has failed to show that juror Carll was actually biased. Competent, substantial evidence supports the postconviction court's determination that juror Carll's comments about her opinion of the death penalty did not establish actual bias. While juror Carll did express positive sentiment toward the death penalty and expressly outlined several circumstances in which she would recommend it, she

confirmed upon follow-up questioning that she was flexible, would "absolutely" listen to aggravation and mitigation, and would listen to mental health evidence. juror Carll also stated that there were certain circumstances where she would not recommend the death penalty, such as if someone was "a party of someone's death." As in *Carratelli*, the record reveals that juror Carll assured the court that she was willing to listen to the evidence, be fair, and follow the law. Her statements showing that she would abide by the law and consider the evidence presented refute the claim that juror Carll was biased. Allen therefore cannot establish prejudice. *See Barnhill v. State*, 834 So. 2d 836, 844 (Fla. 2002) (holding that a juror is unqualified only if she "expresses an unyielding conviction and rigidity toward the death penalty"). Our confidence in the outcome is not undermined. We therefore conclude that the circuit court properly denied relief on this claim.

## II. *Giglio* Claim

Allen next claims that the postconviction court erred in denying her claim that the State committed a *Giglio* violation.

This claim is procedurally barred because it should have been raised on direct appeal where the facts supporting the claim were available. *See Robinson v. State*, 707 So. 2d 688, 693 (Fla. 1998) (finding defendant's *Giglio* claim procedurally barred because defendant failed to raise it on direct appeal).

- 51 -

However, even if the claim were not procedurally barred, it also fails on the merits.

Allen must prove the following to establish a *Giglio* violation:

> (1) the prosecutor presented or failed to correct false testimony; (2) the prosecutor knew the testimony was false; and (3) the false evidence was material. If the first two prongs are established, the false evidence is deemed material if there is any reasonable possibility that it could have affected the jury's verdict. The State must then "prove that the false testimony was not material by demonstrating it was harmless beyond a reasonable doubt." Under the harmless error test, the State must prove "there is no reasonable possibility that the error contributed to the conviction."

*Franqui v. State*, 59 So. 3d 82, 101-02 (Fla. 2011) (citations omitted) (quoting *Tompkins v. State*, 994 So. 2d 1072, 1091 (Fla. 2008), and *Guzman v. State*, 941 So. 2d 1045, 1050 (Fla. 2006)). Because *Giglio* claims present mixed questions of law and fact, we defer to the postconviction court's factual findings supported by competent, substantial evidence and review the court's legal conclusions de novo. *Green v. State*, 975 So. 2d 1090, 1106 (Fla. 2008).

Allen argues that the State elicited and failed to correct false testimony that Allen was convicted several times for selling drugs. The record shows that the prosecutor asked Hudson on cross-examination, "You were aware that she was convicted several times for selling drugs, right?" Hudson answered in the affirmative. During closing arguments, the prosecutor stated to the jury, "You heard about the defendant's time in prison for previous drug sale convictions."

The record demonstrates that the State violated *Giglio* with respect to Hudson's testimony. The prosecutor presented and failed to correct false testimony from Hudson regarding Allen's criminal record by asking if Hudson knew that Allen was convicted many times for selling drugs. It is undisputed that Allen had only one conviction for selling drugs. The record shows that the State had knowledge of this fact because it prepared Allen's Criminal Code Scoresheet prior to trial. However, the false evidence presented by the State is immaterial, because there is no reasonable possibility that the number of prior drug convictions that Allen had contributed to the jury's sentencing recommendation. There is no reasonable possibility that the fact that the jurors heard that Allen had multiple prior drug convictions—as opposed to just one prior drug conviction—would have had an impact on their vote in the face of the evidence detailing the horrific events during Wright's kidnapping that resulted in her murder. We conclude that the State's use of this false evidence was harmless beyond a reasonable doubt. Therefore, we affirm the circuit court's denial of Allen's *Giglio* claim.

### III. *Hurst* Claim

Allen lastly argues that the postconviction court erred in denying her relief from her sentence of death under the *Hurst* decisions. We affirm the postconviction court's ruling on this claim because the State proved beyond a reasonable doubt that the *Hurst* error was harmless and because Allen's *Hurst*-

induced *Caldwell v. Mississippi*, 472 U.S. 320 (1985), claim fails to show that the standard jury instructions violate the Eighth Amendment.

In *Hurst v. Florida*, the United States Supreme Court held that "[t]he Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death" and that "[a] jury's mere recommendation is not enough." 136 S. Ct. at 619. On remand, we reached the following holding:

> [B]efore the trial judge may consider imposing a sentence of death, the jury in a capital case must unanimously and expressly find all the aggravating factors that were proven beyond a reasonable doubt, unanimously find that the aggravating factors are sufficient to impose death, unanimously find that the aggravating factors outweigh the mitigating circumstances, and unanimously recommend a sentence of death.

*Hurst v. State*, 202 So. 3d at 57. We then concluded that *Hurst* error is capable of harmless error review. *Id.* We also explained that the standard to be used in harmless-error analysis is whether there is a "reasonable possibility that the error contributed to the sentence," and stated that, in the context of *Hurst* error, the burden is on the State "to prove beyond a reasonable doubt that the jury's failure to unanimously find all the facts necessary for imposition of the death penalty did not contribute to [the] death sentence." *Id.* at 68. In *Mosley*, 209 So. 3d at 1283, we held that *Hurst v. State* applies retroactively to all defendants whose sentences of death became final after the Supreme Court issued *Ring v. Arizona*, 536 U.S. 584 (2002).

Here, because Allen's sentence was final in 2014, *Allen v. Florida*, 135 S.

Ct. 362 (2014) (denying certiorari), the *Hurst* requirements are retroactive to her

sentence. The parties do not dispute that the *Hurst* requirements were not met, but

disagree over whether the *Hurst v. State* error was harmless.

In *King v. State*, 211 So. 3d 866, 890 (Fla. 2017), we determined that a

jury's unanimous recommendation of a death sentence in capital cases "begins a

foundation for us to conclude beyond a reasonable doubt that a rational jury would

have unanimously found that there were sufficient aggravators to outweigh the

mitigating factors." We have also recognized that a unanimous recommendation

alone is insufficient to determine harmless error, and that we must also consider

other factors such as the jury instructions, the aggravators and mitigators, and the

facts of the case. *See Reynolds v. State*, 251 So. 3d 811, 816 (Fla. 2018); *Kaczmar

v. State*, 228 So. 3d 1, 9 (Fla. 2017); *Davis v. State*, 207 So. 3d 142, 174-75 (Fla.

2016). Here, the jury recommendation of death was unanimous. Although Allen's

jury was instructed that it was "neither compelled or required to recommend

death," and was informed that unanimous recommendations were not required, it

nevertheless unanimously recommended death. The jurors also heard standard jury

instructions informing them that they needed to determine whether sufficient

aggravators existed and whether any aggravation outweighed the mitigation before

recommending a sentence of death. The trial court instructed the jury, "Should you

find sufficient aggravating circumstances do exist to justify recommending the imposition of the death penalty, it will then be your duty to determine whether the mitigating circumstances outweigh the aggravating circumstances that you find to exist." Fla. Std. Jury Instr. (Crim.) 7.11 (2014). Although the jurors were not informed that the finding that sufficient aggravators existed and outweighed the mitigation must be unanimous, the jury did return a unanimous verdict of death. *See id.* ("If, after weighing the aggravating and mitigating circumstances, you determine that at least one aggravating circumstance is found to exist and that the mitigating circumstances do not outweigh the aggravating circumstances, or, in the absence of mitigating factors, that the aggravating factors alone are sufficient, you may recommend that a sentence of death be imposed rather than a sentence of life in prison without the possibility of parole."). These instructions support the conclusion that the jury unanimously made the requisite factual findings to impose death before it recommended death unanimously. The *Hurst* error in this case is therefore harmless, as it is clear beyond a reasonable doubt that the jury's failure to find the facts necessary to impose the death penalty did not contribute to the death sentence.

Allen's jury also unanimously found her guilty of kidnapping, which the trial court used to find the in the course of kidnapping aggravator. *Allen*, 137 So. 3d at 953, 955. Further, the trial court found that the murder was especially

heinous, atrocious, or cruel (HAC), by competent, substantial evidence. *Id*. at 955.

We have held that the HAC aggravator is among the most weighty and serious aggravating factor in the sentencing scheme. *See Knight v. State*, 225 So. 3d 661, 683 (Fla. 2017). Moreover, as the trial court noted, the disturbing facts of this case further support the conclusion that the *Hurst* error is harmless. Wright was bound and beaten, unable to leave Allen's home. *Allen*, 137 So. 3d at 963-64. She was strangled even as she screamed for mercy. *Id*. She died a terror-filled and painful death. *Id*.

We therefore conclude that, beyond a reasonable doubt, a rational jury would have unanimously found that sufficient aggravating factors outweighed the mitigation.

Allen next contends that she is entitled to relief pursuant to the Supreme Court's analysis in *Caldwell v. Mississippi*, because her death sentence, recommended by an allegedly improperly instructed jury, violates the Eighth Amendment in light of *Hurst*. She argues that the *Hurst* decisions require that jury verdicts be unanimous and not advisory, rendering the Standard Jury Instruction 7.11 used in her trial violative of *Caldwell* because the improperly instructed jury did not feel the weight of its sentencing responsibility—which contributed to the jurors' votes for death. As we recently held in *Reynolds*, this claim fails and does not "provide an avenue for *Hurst* relief." 251 So. 3d at 828.

In *Caldwell*, the Supreme Court held that the death sentence resulting from the jury's unanimous recommendation of death violated the Eighth Amendment's standard of reliability required in capital cases because the jury instructions impermissibly diminished the jurors' sense of responsibility for a death sentence by "[leading them] to believe that the responsibility for determining the appropriateness of the defendant's death rest[ed] elsewhere." *Caldwell*, 472 U.S. at 328-29. In *Romano v. Oklahoma*, 512 U.S. 1, 9 (1994), the Supreme Court held that, to establish a *Caldwell* error, a defendant must show that the jury instructions improperly described their jury's role assigned by local law.

Allen cannot make that showing. We have held that because it did not violate *Caldwell* to refer to the jury's role as advisory prior to the *Hurst* decisions, "a *Caldwell* claim . . . cannot [now] be used to retroactively invalidate the jury instructions that were proper at the time under Florida law." *Reynolds*, 251 So. 3d at 825. At the time of Allen's trial, the jury instructions correctly advised the jury, stated the law applicable at the time, and did not diminish the jury's role. Because Allen's jury was properly instructed based on the existing law, the jury instructions given at her trial do not cause her death sentence to violate the Eighth Amendment. We therefore affirm the postconviction court's denial of Allen's *Hurst* claim.

## CONCLUSION

For the reasons stated above, we affirm the circuit court's denial of Allen's rule 3.851 motion for postconviction relief.

It is so ordered.

LEWIS, LABARGA, and LAWSON, JJ., concur.
CANADY, C.J., and POLSTON, J., concur in result.
PARIENTE, J., dissents with an opinion.
QUINCE, J., dissents.

ANY MOTION FOR REHEARING OR CLARIFICATION MUST BE FILED ON OR BEFORE DECEMBER 27, 2018. A RESPONSE TO THE MOTION FOR REHEARING/CLARIFICATION MAY BE FILED ON OR BEFORE JANUARY 2, 2019. NOT FINAL UNTIL THIS TIME PERIOD EXPIRES TO FILE A REHEARING/CLARIFICATION MOTION AND, IF FILED, DETERMINED.

PARIENTE, J., dissenting.

It is undisputed that this is a terrible crime. But, without a full picture of Allen's upbringing and background, the jury could never have understood the full extent of the mitigation in her case, which could have caused at least one juror to recommend life. Because Allen's attorney's failure to properly investigate and present mitigation evidence—specifically the testimony of Allen's aunt, Barbara Capers, who could have given first-hand accounts of the abuse Allen suffered—constitutes deficient performance and the absence of important mitigation undermines confidence in the jury's unanimous recommendation for death, I dissent.

- 59 -

Capers, who was available and willing to testify, would have presented a considerably more complete and detailed picture of Allen's horrific childhood and early adult life, including first-hand accounts and graphic details of the physical and sexual abuse Allen suffered at the hands of her family members and former boyfriends. The testimony would not have been cumulative to the testimony presented at trial. Rather, it would have been compelling based on Caper's first-hand knowledge of the events of Allen's life. However, Allen's attorney never so much as even contacted Capers, even though Capers was at all times available to testify. Thus, because Allen has established ineffective assistance of counsel, I conclude that Allen's sentence of death should be vacated, and this case should be remanded for a new penalty phase.

## BACKGROUND

Approximately two and a half years before trial, Allen's case was reassigned from the public defender's office to defense counsel. Upon taking Allen's case, counsel failed to conduct an independent investigation into mitigation. Trial counsel only spoke with two mitigation witnesses before the trial—(1) Allen's aunt, Myrtle Hudson, and (2) Allen's sister, whose name he did not remember. He did not enlist the help of an investigator or mitigation specialist. At the postconviction evidentiary hearing, counsel testified that he thought the "witnesses

were all lined up" before he took the case and it was just a matter of "putting [the mitigation] on."

Had she been asked to testify, Allen's aunt, Barbara Capers, could have added the following testimony: that she personally witnessed Allen's mother physically abusing Allen by beating her with her hands and fists almost every day; Allen's mother would also beat Allen with belts, whip her with sticks, and slap her in the face; when Allen was twelve, her mother beat her so badly that Capers called the police; Allen's grandfather also physically abused Allen, he would line up the boys and girls naked, including Allen, and go down the row beating them with oak switches; Allen also witnessed her grandfather being abusive to her mother; in her twenties, Allen was beat up by her boyfriend, Bill Skane, and was unrecognizable when Capers visited her in the hospital; Capers witnessed Allen's paramour abuse her many times while she was pregnant, including one time he and another boy kicked and punched Allen in the stomach; when Allen was a young girl, her mother went to jail and Allen stayed with her grandfather, and Allen told Capers that she wanted to stay with her instead because he was sexually molesting her; Allen's uncle Roy also sexually molested her when he visited the grandfather every other weekend; Capers saw Roy touch and grab Allen in private places like her breasts and kiss her on the mouth; Allen told Capers that her brother and

another man sexually molested her; Allen had a stroke as a teenager that affected her speech and her memory; and Allen demonstrated signs of severe anxiety.

## ANALYSIS

As the majority explains, to be entitled to relief on her claim of ineffective assistance of counsel, Allen must satisfy both prongs of the *Strickland v. Washington*, 466 U.S. 668 (1984), analysis—(1) that counsel was deficient and (2) as a result of counsel's deficiency, confidence in the outcome of the trial is undermined.

### 1. Deficiency

Although Capers' testimony would have involved the same subject as evidence presented at trial, it is not merely cumulative—as the majority and postconviction court suggest. It is impossible to conclude that Capers' testimony would have been similar in breadth and detail to Hudson's. Rather, Capers' testimony was more detailed and included many personal, eyewitness accounts to the abuse Allen suffered. Certainly, hearing first-hand accounts of the abuse suffered by Allen would be far more impactful on the jury than Hudson's vague recollection of Allen's childhood.

Further, Allen's childhood and history of abuse were the most significant mitigation the defense presented during the penalty phase. *See* per curiam op. at 5-6, note 2. While Hudson's testimony was a critical component of the mitigation

presented because it could help the jury understand why Allen committed this heinous crime, Capers' testimony would have undoubtedly painted an even clearer picture for the jury of this mitigation, as explained above.

Thus, trial counsel's investigation was wholly insufficient and "fell short of the standards for capital defense work articulated by the American Bar Association (ABA)—standards to which [the United States Supreme Court] long have referred as 'guides to determining what is reasonable,' " which provide that efforts must be made to discover all reasonably available mitigation and evidence to rebut aggravators. *Wiggins v. Smith*, 539 U.S. 510, 524 (2003); *see* Am. Bar Ass'n, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 10.11* (rev. ed. 2003). Accordingly, I would conclude that Allen has satisfied the first prong of the *Strickland* analysis.

## 2. Prejudice

The postconviction court concluded that Allen failed to establish prejudice because, with the "significant aggravators found and the comparatively weak mitigation found, it is unlikely that the additional mitigation presented would have been sufficient to outweigh the established aggravation." Postconviction Ct. Order at 76. Further, the majority asserts that Allen "overemphasizes the value of evidentiary hearing testimony presented by Allen's family members," specifically that the "testimony presented regarding Allen's background was cumulative to the

mitigation already presented at trial." Per curiam op. at 21-22. The majority

concludes that Allen could not have suffered prejudice because of the mitigation

already presented in this case and the strong aggravation that was presented, which

they argue is evidenced by the unanimous jury verdict. *Id.*

However, the majority fails to take into consideration the effect of *Hurst*[5] on

the analysis. As this Court explained in *Bevel v. State*, 221 So. 3d 1168 (Fla.

2017), the question of prejudice was significantly altered by this Court's opinion in

*Hurst*:

> Thus, this Court unquestionably focuses on the effect the
> unpresented mitigation could have had on the jury's ultimate
> recommendation. For instance, in *Hurst v. State*, 18 So. 3d 975 (Fla.
> 2009), in addressing whether there was deficient performance and
> prejudice, we reasoned that "[b]ecause this mitigation was not made
> available for the jury or the trial judge to consider before the death
> sentence was imposed, our confidence in the imposition of the death
> penalty in this case is undermined." *Id.* at 1015. After our more
> recent decision in *Hurst*, where we determined that a reliable penalty
> phase proceeding requires that "the penalty phase jury must be
> unanimous in making the critical findings and recommendation that
> are necessary before a sentence of death may be considered by the
> judge or imposed," 202 So. 3d at 59, we must consider whether the
> unpresented mitigation evidence would have swayed one juror to
> make "a critical difference." *Phillips* [*v. State*], 608 So. 2d [778,] 783
> [(Fla. 1992)].

---

5. *Hurst v. State* (*Hurst*), 202 So. 3d 40 (Fla. 2016), *cert. denied*, 137 S. Ct. 2161 (2017); *see Hurst v. Florida*, 136 S. Ct. 616 (2016). *Hurst* applies retroactively to Allen's sentence of death, which did not become final until 2014. *Allen v. State*, 137 So. 3d 946 (Fla. 2013), *cert. denied*, 135 S. Ct. 362 (2014).

221 So. 3d at 1182.

Hudson testified at the postconviction evidentiary hearing that she told counsel about Capers and her willingness to testify in Allen's case. Further, Capers testified at the postconviction evidentiary hearing that she was contacted by an attorney—not Allen's trial counsel—before trial, was available to speak with an expert, and wanted to testify, but was not asked to do so. Rather than looking into Capers' testimony, trial counsel relied solely on Hudson's testimony for information regarding Allen's childhood and adult life. In fact, Capers wanted to help Allen but was never told that her testimony could help; she was even present in the courtroom for the duration of the trial.

Clearly, as explained above, Capers' testimony would have better illustrated for the jury the trauma in Allen's childhood, development, and surroundings as an adult. Indeed, counsel conceded that it would have been beneficial to find witnesses to substantiate Allen's violent family life. *See Walker v. State*, 88 So. 3d 128, 140 (Fla. 2012). Further, the additional "insight into [Allen's] childhood and young adulthood" that Capers could have provided would have "serv[ed] to humanize [her] to the jury" and could have persuaded jurors to be more sympathetic and merciful. *Id.* at 140-41. Thus, I conclude that prejudice has been established because our confidence in the unanimous jury verdict should be undermined.

## CONCLUSION

It is clear that Capers' testimony would have provided the jury with a more complete and accurate picture of the powerful mitigation in Allen's case. However, because of the failure of Allen's attorney to investigate and present this mitigation evidence, the jury only received a partial understanding of the abuse Allen suffered as a child and into her adult life. This half-truth undoubtedly undermines our confidence in Allen's sentence of death. Thus, I would vacate Allen's sentence of death and remand for a new penalty phase.

Accordingly, I dissent.

An Appeal from the Circuit Court in and for Brevard County,
David Dugan, Judge - Case No. 052005CF048260AXXXXX

Maria DeLiberato, Capital Collateral Regional Counsel, Raheela Ahmed, Maria Christine Perinetti, and Lisa Marie Bort, Assistant Capital Collateral Regional Counsel, Middle Region, Temple Terrace, Florida,

for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and Doris Meacham, Assistant Attorney General, Daytona Beach, Florida,

for Appellee